1  Arnold P. Lutzker, DC Bar No. 101816, PRO HAC VICE to be applied for
2  Jeannette M. Carmadella, DC Bar No. 500586, PRO HAC VICE to be applied for
   Lutzker & Lutzker LLP
3  1233 20th Street, NW, Suite 703
   Washington, DC 20036
4  Telephone No. 202-408-7600 Ext. 1
   Fax 202-408-7677
5  Email: arnie@lutzker.com

6
   James M. Mulcahy (SBN 213547)
7  jmulcahy@mulcahyllp.com
   Kevin A. Adams (SBN 239171)
8  kadams@mulcahyllp.com
9  Mulcahy LLP
   One Park Plaza, Suite 225
10 Irvine, California 92614
11 Telephone No. (949) 252-9377
   Fax 949-252-0090
12

13 ATTORNEYS FOR PLAINTIFFS

14            UNITED STATES DISTRICT COURT

15            CENTRAL DISTRICT OF CALIFORNIA

16

17 ASSOCIATION FOR INFORMATION          Case No.: **CV10-09378 CBM (MANx)**
18 MEDIA   AND EQUIPMENT, an Illinois
   nonprofit membership organization; and   **COMPLAINT FOR:**
19 AMBROSE VIDEO PUBLISHING, INC., a
20 New York corporation,                 (1) **Breach of Written Contract;**
                                         (2) **Copyright Infringement;**
21        Plaintiffs,                    (3) **Violation of 17 U.S.C. § 1201;**
                                         (4) **Breach of Covenants of Good**
22        v.                                 **Faith and Fair Dealing;**
23                                       (5) **Unjust Enrichment; and**
   THE REGENTS OF THE UNIVERSITY OF      (6) **Tortious Interference with**
24 CALIFORNIA, a California corporation;     **Business Relationships**
   DR. GENE BLOCK, CHANCELLOR OF
25 THE UNIVERSITY OF CALIFORNIA,
26 LOS ANGELES, an individual,           **DEMAND FOR JURY TRIAL**
27
28        Defendants.

                                    1
                               COMPLAINT

Association for Information Media and Equipment ("AIME") and Ambrose Video Publishing, Inc ("AVP") (collectively, the "Plaintiffs") allege as follows:

## NATURE OF THE ACTION

1.      The Defendants in this case are The Regents of California,("Regents") in their official capacity as an arm of the State of California governing the University of California at Los Angeles ("UCLA"), and in their individual capacities as members of the Board of Regents, and Dr. Gene Block, Chancellor of UCLA, in his official and individual capacity (the "UCLA Chancellor") (collectively the "Defendants").

2.      The Plaintiffs in this case are AVP, a producer and distributor of educational videos, and AIME, a trade association dedicated to copyright education and compliance, whose membership includes AVP, similarly situated video publishers and distributors and a wide variety of educational institutions.

3.      This case involves the Defendants' assertion that UCLA, one of the largest educational providers in the United States, can take copy-protected DVDs, produced and/or distributed by AVP and other AIME members, and stream these DVDs via the Internet or the UCLA intranet to faculty and students enrolled in their courses in derogation of existing licenses and established copyright law.

4.      To accomplish this unlawful activity, upon information and belief, UCLA utilizes Video Furnace, a system manufactured and sold by Hai Vision Sysms, Inc. ("HV").  Video Furnace allows for the unauthorized recording of content and then its delivery as video on demand to computers and set top boxes.  According to HV 2009

publicity, UCLA was one of a handful of national universities that helped HV design Video Furnace for use on college campuses.

5.     As background to the dispute, on information and belief, sometime around January 2006, UCLA's Instructional Media Collections & Services ("IMCS") acquired HV's Video Furnace system, and began copying AVP and other programs and then streaming them on the University's web-based intranet.  The particular AVP programs, which were acquired by UCLA in DVD format from AVP, are a series of the British Broadcasting Company ("BBC") productions of Shakespeare plays ("AVP DVDs").  The DVD streams were linked to course web pages and accessible remotely by students and faculty, enrolled in or teaching the course.  Over a five year period, UCLA told AVP that 13 programs were streamed more than 130 times to an unspecified number of students and faculty.

6.     AVP learned about the practice in 2009.  Through AIME, AVP approached UCLA and objected to the practice.  AIME explained that UCLA's streaming practice violated established copyright law.  AVP also explained that streaming was a violation of the AVP DVD license.

7.     Because AVP had anticipated the need of educational institutions for streaming media, AVP explained that it actually offered reasonably-priced institutional streaming licenses that would enable the school to make AVP DVDs available lawfully.  AVP provides streamed videos with Closed Captions in compliance with federal disability law requirements.

8.     Despite these overtures, UCLA was unrelenting.  Initially, UCLA claimed absolute entitlement pursuant to two provisions of copyright law, 17 U.S.C. §110(1) (the public performance exemption for "face-to-face" teaching) and 17 U.S.C. §107 (fair use).  It later added reliance upon 17 U.S.C. §110(2) (the public performance exemption for certain digital distance learning uses).

9.     After AVP and AIME confronted UCLA with the prospect of a legal challenge to these theories, on information and belief, UCLA temporarily desisted, but after a winter-break period of reflection, it notified AVP that based on legal advice it concluded that it had the right to stream, so the practice would continue unabated.  On information and belief, the practice continues to this day.

10.    If UCLA and other educational institutions are allowed to acquire DVDs of education video publishers and then copy and stream them to students without a license and without compensation to the creators, then new markets for pre-existing works will be unfairly preempted and the educational video business will suffer greatly.  This is a legal dispute rooted in a) UCLA's failure to comply with unambiguous provisions of AVP's DVD license, and b) UCLA's copyright practices, as implemented by and through the Regents and the UCLA Chancellor, to intentionally misinterpret three provisions of copyright law, which provide only narrowly crafted educational use exceptions, all after notice that these actions were legally indefensible.  Any limitation in copyright law, taken too far as the Defendants do, destroys the delicate balance between the policy that inspired its formulation and

the intent of copyright law to compensate creators.  This case is about ensuring that the delicate balance is properly respected and not abused.

11.     This case is also about the fair adherence to contractual agreements between the UCLA and the video publishers who license use of their programs.

PARTIES

12.     AVP is a New York corporation, whose principal business is the creation and distribution of high quality video content for the educational marketplace.  AVP licenses its video programs to schools and colleges throughout the United States, including the State of California.

13.     AIME is an Illinois non-profit membership organization offering copyright information and support to teachers, librarians, media center directors, producers and distributors of informational film, video, interactive technologies, computer software and equipment.  AIME's mission is to promote fair and appropriate use of the media and equipment delivering information in a rapidly changing world.  AIME asserts standing to sue in this proceeding as an associational Plaintiff on behalf of its members because: (1) its members have standing to sue on their own for infringement of copyrights; (2) the copyright interests that AIME seeks to protect are germane to AIME's purpose; and (3) neither the claims asserted by AIME, nor the declaratory relief requested by AIME, requires the participation of individual members in the lawsuit.

14.     The Regents is a corporation incorporated under the laws of the State of California, and its power derives from Article IX, Section 9 of the California Constitution. According to its Bylaws, namely Bylaw 5.1(a), the Regents has "full powers of organization and government" subject only to limited legislative control. The Regents is made up of a 26 member board and two nonvoting faculty members. The Regents administers the University of California educational system as a public trust, of which UCLA is a member.

15.     UCLA Chancellor is the chief executive of the UCLA, and is the individual in charge of all university policies and their implementation.

16.     The Regents and the UCLA Chancellor are sued in their individual capacities for contributing to the violations of copyright law and contract as asserted by AVP and AIME.

JURISDICTION AND VENUE

17.     This is a civil action for breach of contract, breach of covenants, unjust enrichment and tortious interference with business relationships under common law, and violation of the Copyright Act of 1976, as amended, 17 U.S.C. §101, *et. seq.* and for declaratory relief.

18.     The Court has personal jurisdiction over the Regents as a corporation incorporated under the laws of California, and over the Regents and the UCLA Chancellor as individuals residing in the State of California.

6
COMPLAINT

19      This Court has subject matter jurisdiction to hear Plaintiff's copyright

infringement claim under 17 U.S.C. §101 et seq., 28 U.S.C. §§ 1331 and 1338,

supplemental jurisdiction to hear all other claims under 28 U.S.C. §1367, and

jurisdiction over declaratory relief requested under 28 U.S.C. §§2201(a) and 2202.

Venue is proper under 28 U.S.C. §1391(b) and 28 U.S.C. §1400(a).

## FACTS

## I.  DEFENDANTS INFRINGE AMBROSE COPYRIGHTED DVDS AND BREACH THE AMBROSE DVD LICENSE

### A.  The Ambrose Educational DVD Offerings

20.    For more than twenty years, AVP has produced and distributed high quality

programs in science, history and drama.  Not only has AVP produced award winning

programs, but also it has acquired works from third parties, such as the BBC,

Discovery Channel and independent producers.   AVP programs are licensed to

educational institutions in all digital formats.  DVDs have been available since the

year 2000 and Mpeg files in other formats have been available since 2002.

21.    Many AVP titles feature supplemental educational content, such as concept

clips, closed captioning, Spanish subtitles, research guides, maps, timelines, and

historical documents using computer graphics, all to enrich the learning experience for

students and teachers.   Exhibit 1 is the Ambrose Educational DVD Catalog 2009-

2010.

22.    In addition to licensing programs for classrooms and libraries, a number of

years ago, AVP made a substantial investment to create Ambrose Video 2.0, a

7
COMPLAINT

download program and video streaming website (located at www.ambrosedigital.com)

that allows educational clients to access more easily the AVP catalog in a number of

digital formats.  Given the ever-growing needs of educational institutions to provide

varied and flexible content delivery systems for its faculty and student body, Ambrose

Video 2.0 has become one of Plaintiff's primary delivery options for educational

offerings.   To initiate Ambrose Video 2.0, older video programs, along with newer

ones, had to be encoded, captioned and stored.  Then, the technological system to

enable efficient real-time delivery had to be developed and implemented.  Ambrose

Video 2.0 puts AVP at the forefront of educational video publishers who strive to

serve the growing needs and interests of the educational community.  Exhibit 2

consists of pages from the Ambrose Educational DVD Catalog providing further

detail on Ambrose Video 2.0.

23.     To meet its obligations to program producers and its own financial needs, AVP

has established terms and conditions that control the use of DVD programs, and it

licenses schools and universities, including UCLA, the right to use copyrighted

programs available in DVD format as set forth in the license.  The terms of the license

are set forth on the company's website at http://www.ambrosevideo.com/order.cfm.

See Exhibit 3 ("AVP License").

24.     In particular, the AVP DVD License provides:

> **1. Grant of License:** AVP grants to the Licensee a limited, non-exclusive,
> revocable license to use the Content (as defined below) in an educational OR
> home video setting.

**CUSTOMER ACKNOWLEDGES THAT THE PROGRAMS MAY NOT BE DUPLICATED, BROADCAST, TRANSMITTED BY CABLE OR OTHERWISE, ON ANY MULTI-RECEIVER OPEN OR INTERNET SYSTEM, OR DISPLAYED BEFORE THE PUBLIC, WHETHER OR NOT ADMISSION IS CHARGED. CUSTOMER SHALL EXHIBIT THE PROGRAMS ONLY AS HEREIN SPECIFIED AND USE THE PROGRAMS FOR NO OTHER PURPOSE.**

Customer shall not sublicense, sublease or part with possession of any Program received by Customer hereunder. Performing rights to music contained in any Program are not granted herein. Nothing herein shall derogate from any rights of Ambrose or any other copyright proprietor of any Program under the United States Copyright Law or any applicable foreign copyright laws. The Content is licensed solely for classroom teaching, research, educational non-commercial multimedia projects, classroom presentations, and individual presentations for use in educational institutions or public libraries.

**B.**     *Streaming of AVP Video Content*

25.     While use of AVP DVDs is subject to the AVP DVD License, AVP also offers educational institutions the ability to acquire streaming rights to programs via Ambrose Video 2.0.

26.     "Streaming" is the process whereby content is a) copied to conform to the format of a transmitting unit, b) sent in compressed form over the Internet, and c) displayed by a viewer in real time.  With streaming video, a viewer does not have to wait for an entire program to download; rather, the data is displayed as a continuous "stream" of video as it arrives.

27.     To produce the stream, the source needs a device that copies, conforms the work to a usable digital format and transmits it.  To see the streamed content, the viewer needs a player, which is a special program that uncompresses the content and sends video data to the display screen and audio data to the speakers.

28.     The process of digitally streaming video programs implicates a number of exclusive copyright rights of educational video publishers and exclusive distributors like AVP, including the right to reproduce or copy a work, the right to publicly perform a work, the right to publicly distribute a work and the right to publicly display a work.[1]

29.     When the streamed work is accessed by the viewer, it is displayed on a screen and the contents are performed.  If the screen is in a public place, like a classroom or auditorium, the display and/or performance is "public."  Similarly, if many persons can view the content in different remote locations, like dorm rooms or apartments in Los Angeles, the copyright law deems such multiple performances "public."[2]

30.     As noted, Ambrose Video 2.0 is an affordable video streaming offering for all kinds of educational institutions, from home schools to research institutions of higher

---

[1] **17 U.S.C. §106. Exclusive rights in copyrighted works**· Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
(1) to reproduce the copyrighted work in copies or phonorecords;
(2) to prepare derivative works based upon the copyrighted work;
(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

[2] **17 U.S.C. §101. Definitions**
To perform or display a work "publicly" means —
(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or
(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

1   education.  Ambrose Video 2.0 has been designed to ensure not only that its programs

2   are made available for use with the newest technological innovations, but also that

3

4   these uses are consistent with the rights and obligations that AVP owes third parties,

5   like the BBC, music authors, screenwriters, photographers and others whose works are

6   distributed or incorporated into AVP programs.  Ambrose Video 2.0 thus incorporates

7   Digital Rights Management ("DRM"), or technological measures designed to control

8

9   access to and copying of the DVDs.

10   31.    The pricing of AVP streaming rights to video programs is tailored to every

11   institutional need.  For example, a license for an unlimited simultaneous stream of the

12

13   BBC's "Hamlet," with closed captioning to all students and faculty served by the

14   UCLA Los Angeles campus for one year can be acquired for $24.99.  AVP bundles up

15   to 50 hours of programming for $889.00.  See Exhibit 4.  Lower priced options are

16

17   available for home schools and individual teachers.

18

19       C.    *UCLA's Breach of Contract and Copyright Infringements*

20

21   32.    Pursuant to the AVP DVD License, UCLA acquired 37 of AVP BBC's

22   Shakespeare Plays in 2006.  These programs, which AVP licensed from the BBC for

23   distribution, are among the most popular of the AVP offerings.

24

25   33     Given the license restrictions on streaming AVP videos and the reasonableness

26   of the Ambrose Video 2.0 streaming license, it came as a rude shock when AVP

27   learned that IMCS had been streaming AVP programs for years without prior request,

28

approval, or any effort on their part to ascertain whether such a license was deemed necessary or available.

34.    At the time of that discovery, AVP enlisted the support of AIME, a non-profit trade association, whose mission is to promote fair and appropriate use of the media and equipment delivering information in a rapidly changing world.[3]

35.    On May 19, 2009, Betty G. Ehlinger, Executive Director of AIME, wrote Ross Bollens, Director of Information Technology Security of UCLA's Office of Information Technology, regarding the revelation by Pat O'Donnell Manager, UCLA Media Collections Library, that UCLA has been utilizing Video Furnace to copy, digitize and stream AVP's BBC Complete Works of Shakespeare for many years. Writing on behalf of AVP and other AIME members whose works were likely also copied, digitized and streamed, Ms. Ehlinger advised UCLA that this practice violated copyright law and member licenses and sought an accounting of the activities and compliance with licenses and the law.  See Exhibit 5.

36.    Since no response from Mr. Bollens was promptly forthcoming, on June 18, 2009, Ms. Ehlinger wrote a follow up letter to Dr. Gene Block, the UCLA Chancellor. See Exhibit 6.

37.    On July 24, 2009, L. Amy Blum, Senior Campus Counsel responded to both of Ms. Ehlinger's letters.  See Exhibit 7.  In her response, Ms. Blum set forth legal

---

[3] See http://aime.org/ (last visited on July 4, 2010).  The President of the AIME Board of Directors is Allen Dohra, Vice President-Sales of AVP.

defenses for UCLA's digitizing and streaming practices, citing Sections 107 and 110(1) of the Copyright Act. 17 U.S.C. §§107 and 110(1).

38.    On September 16, 2009, Arnold P. Lutzker, Counsel for AIME, replied to Ms. Blum's analysis, in which he contested both prongs of UCLA's defense, indicating that neither Section 107, nor Section 110(1), authorized or allowed the UCLA practices.  See Exhibit 8.  Mr. Lutzker urged that the parties should meet to see if a resolution of the dispute was feasible, but that before such meeting, UCLA should provide more details regarding digitizing and streaming of AIME member programs.

39.    On October 21, 2009, UCLA responded, indicating that it would meet with AIME and that IMCS would temporarily stop streaming content outside the Library commencing December 20, 2009.  See Exhibit 9.  Although UCLA sought to narrow its liability, that suggestion was rejected by letter dated October 28, 2009.  See Exhibit 10.

40.    A meeting of the parties was held on January 19, 2010, but did not resolve the dispute.

41.    On information and belief, by public pronouncement and by letter dated March 2, 2010, UCLA publicly announced and advised AVP that it would resume copying and streaming DVDs from its libraries, adding Section 110(2), 17 U.S.C. §110(2), as an additional justification for its practice, and indicating that it would require professors to articulate a pedagogical purpose for any streaming request.  See Exhibit 11.

1

### D.   UCLA's Actions Violate the Copyright Law Including the DMCA

2   42.   On information and belief, UCLA uses HV's Video Furnace to copy, distribute,

3   perform and display AVP DVDs, all in violation of AVP's copyright rights.

4

5   43.   On information and belief, the preparation of the copies of AVP programs

6   utilizing Video Furnace entails the bypassing of copy-guarded codes embedded within

7   each AVP DVD.  Copy-guarded codes are an integral part of AVP's Digital Rights

8   Management ("DRM") system, or technological measures that AVP employs to

9   prevent unauthorized access, copying and use of AVP DVDs, are a key mechanism

10  not only for implementing the license restrictions in the AVP DVD License, but also

11  for assuring compliance with AVP's obligations to third parties whose programs it

12

13  distributes or works it incorporates with AVP DVDs.

14

15  44.   On information and belief, the circumvention of AVP's DRM constitutes

16  violations of Sections 1201(a) and (b) of the Copyright Act.[4] 17 U.S.C. §1201(a) and

17

18

---

19  [4] **17 U.S.C. §1201 Circumvention of copyright protection systems**. (a) Violations Regarding Circumvention of Technological Measures. — (1)(A) No person shall circumvent a technological measure that effectively controls access

20  to a work protected under this title. ... (2) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that —

21  (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

22  (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

23  (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title. ...

24  (b) Additional violations – (1) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that – [A] is primarily designed or produced for the

25  purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; (B) has only limited commercially significant purpose or use other

26  than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or (C) is marketed by that person or another acting in concert with that

27  person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

28

(b).  On information and belief, the Defendants are liable in their individual and official capacities for UCLA's circumventing AVP's technological measures that effectively control access to and copying of its programs.

45.    On information and belief, UCLA worked in close coordination with HV and a few other universities, to develop Video Furnace applications for use by higher education.  According to statements that have appeared on HV's website:

> HaiVision's Video Furnace is the premier package for end-to-end delivery of content for higher education and K-12 institutions. Video Furnace is ideal for delivering cable content in dormitories and across the campus, for providing video-on-demand content for use within classes and by students at their leisure, for launching campus TV stations, for making special classes or events available to everyone, and for recording classes and events for later review. ... *Video Furnace was initially developed in close collaboration with a number of leading universities including Northwestern, Dartmouth, and UCLA.* http://www.haivision.com/applications/education (accessed September 13, 2009.)  Emphasis supplied.

46.    On information and belief, based on its assistance to HV, UCLA has trafficked in Video Furnace which is a technology, product, service, device, component, or part thereof, that (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title; (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or (C) is marketed by HV in concert with UCLA with knowledge of its use in circumventing a technological measure that effectively

controls access to a work protected under copyright law, in violation of 17 U.S.C. §1201(a).

47.   On information and belief, UCLA acted in concert with HV in the development of Video Furnace, with knowledge that Video Furnace can be used to circumvent technological measures, like those employed by AVP on AVP DVDs, to limit access to its copyrighted DVDs, in violation of 17 U.S.C. §1201(a).

48.   On information and belief, based on its assistance to HV, UCLA has trafficked in Video Furnace, a technology, product, service, device, component, or part thereof, that (A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; (B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or (C) is marketed by HV in concert with UCLA with knowledge of its use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title, in violation of 17 U.S.C. §1201(b).

49.   On information and belief, UCLA acted in concert with HV in the development of Video Furnace, with knowledge that Video Furnace can be used to circumvent protection afforded by a technological measure that effectively protects a right of a

copyright owner under copyright law, like the copy-guard DRM employed by AVP on AVP DVDs, in violation of 17 U.S.C. §1201(b).

*E.  None of the Copyright Defenses Asserted by Defendants Supports Their Infringing Actions*

50.    AVP has registered the AVP DVDs exploited by UCLA with the U.S. Copyright Office.  A copy of the Registration Certificate for Hamlet is attached hereto.  See Exhibit 12.

51.    Contrary to the Defendants' assertions, Section 110(1), 17 U.S.C. §110(1), does not sanction UCLA's copying and streaming of AVP's DVDs.  Section 110(1) only permits the public performance or public display of copyrighted works in the course of face-to-face teaching activities of instructors and students of non-profit educational institutions in classrooms or similar places of teaching.[5]  Moreover, Section 110(1) does not exempt the distribution of video programming from a remote location like UCLA's media center to places that are not similar to classrooms such as dormitories, apartments, or auditoriums, where the audience is not confined to a particular academic class.

52.    Section 110(1) also intends that viewing be simultaneous between teacher and students in order for the face to face teaching exception to apply.  Since the streaming activities by UCLA allow students to view the copyrighted material at any time and at

---

[5] **17 U.S.C. §110. Limitations on exclusive rights: Exemption of certain performances and displays -** Notwithstanding the provisions of section 106, the following are not infringements of copyright: (1) performance or display of a work by instructors or pupils in the course of *face-to-face teaching* activities of a nonprofit educational institution, in a classroom or similar place devoted to instruction, *unless, in the case of a motion picture or other audiovisual work, the performance, or the display of individual images, is given by means of a copy that was not lawfully made under this title, and that the person responsible for the performance knew or had reason to believe was not lawfully made.*(Emphasis supplied.)

17
COMPLAINT

1   different times from each other and the professor, the uses do not fall under Section

2   110(1).

3   53.   Further, Section 110(1) only authorizes the performance of a motion picture

4   from a copy that was lawfully made.  Since the streaming was effected by use of an

5

6   unauthorized copy of a licensed DVD, which license expressly prohibits copying, the

7   use of the unlawful copy places this activity outside the scope of Section 110(1).

8

9   54.   Contrary to the Defendants' assertion, Section 110(2), 17 U.S.C. §110(2), does

10   not sanction UCLA's copying and streaming of AVP DVDs.  Section 110(2), also

11   known as The TEACH Act, is a limited exemption designed to allow use of certain

12

13   copyrighted materials in the context of digital distance education.  Most pertinent for

14   purposes of this case is the fact that the statute excludes works, such as AVP DVDs,

15

16   which are separately marketed for licensed streaming for use in classrooms as part of

17   "mediated instructional activities" as defined under copyright law.  Section 110(2)

18   expressly provides that the exception is inapplicable to works "produced or marketed

19

20   primarily for performance or display as part of mediated instructional activities

21   transmitted via digital networks."

22   55.   Equally significant, with respect to motion pictures, the statute is very clear:

23

24   only "reasonable and limited portions" can be exploited, not entire programs as UCLA

25   has done.[6]

26

27   _____

28   [6] **17 U.S.C. §110. Limitations on exclusive rights: Exemption of certain performances and displays –**
*(2) except with respect to a work produced or marketed primarily for performance or display as part of mediated instructional activities transmitted via digital networks, or a performance or display that is given by means of a copy or*

18
COMPLAINT

1    56.    Finally, as with Section 110(1), use of an unlawful copy voids any claim to

2    entitlement.  UCLA's making of unauthorized copies with Video Furnace bars

3    reliance upon the Section 110(2) limitation on liability for public performance and

4

5    public display.

6    57.    Contrary to Defendants' assertions, Section 107, 17 U.S.C. §107, does not

7    sanction UCLA's copying and streaming of AVP's DVDs.  Section 107, copyright

8
     law's "fair use" provision, is a defense to a claim of infringement based upon a factual
9

10   analysis of four statutory criteria.  This means that although an unauthorized use or

11   infringement has occurred, based upon an assessment of the fair use criteria applied to

12
     the facts associated with the specific infringement, the use may be allowed, even
13

14

15

---

16   *phonorecord that is not lawfully made and acquired under this title, and the transmitting government body or accredited*
     *nonprofit educational institution knew or had reason to believe was not lawfully made and acquired,* the performance of
17   a nondramatic literary or musical work or *reasonable and limited portions of any other work,* or display of a work in an
     amount comparable to that which is typically displayed in the course of a live classroom session, by or in the course of a
18   transmission, if —
     (A) the performance or display is made by, at the direction of, or under the actual supervision of an instructor as an
19   integral part of a class session offered as a regular part of the systematic mediated instructional activities of a
     governmental body or an accredited nonprofit educational institution;
20   (B) the performance or display is directly related and of material assistance to the teaching content of the transmission;
     (C) the transmission is made solely for, and, to the extent technologically feasible, the reception of such transmission is
21   limited to —
     (i) students officially enrolled in the course for which the transmission is made; or
22   (ii) officers or employees of governmental bodies as a part of their official duties or employment; and
     (D) the transmitting body or institution —
23   (i) institutes policies regarding copyright, provides informational materials to faculty, students, and relevant staff
     members that accurately describe, and promote compliance with, the laws of the United States relating to copyright, and
24   provides notice to students that materials used in connection with the course may be subject to copyright protection; and
     (ii) in the case of digital transmissions —
25   (I) applies technological measures that reasonably prevent —
     (aa) retention of the work in accessible form by recipients of the transmission from the transmitting body or institution
     for longer than the class session; and
26   (bb) unauthorized further dissemination of the work in accessible form by such recipients to others; and
     (II) does not engage in conduct that could reasonably be expected to interfere with technological measures used by
27   copyright owners to prevent such retention or unauthorized further dissemination. (Emphasis supplied.)

28

without copyright owner's consent.  Since fair use requires a balancing of the four criteria, no judgment can be reached without the four factors being fully assessed.

58.     In other words, fair use is not a blanket right to copy and stream AVP DVDs; rather, the statutory limitation requires a factual evaluation based on the four criteria, applied to specific facts and specific works.  Therefore, UCLA cannot simply claim that fair use broadly exempts it from liability and that it allows it to copy, stream and publicly perform any AVP DVD it chooses.  Rather, fair use requires an evaluation of the relevant facts applicable to each use of each work to determine if the fair use defense is applicable.

59.     In this instance, Defendants have chosen to ignore the fact that UCLA acquired the AVP DVDs pursuant to a license that expressly prohibits copying and streaming.  In addition, on information and belief, UCLA has not sought to exploit "reasonable and limited portions" of particular AVP DVDs, but rather has decided to exploit the copyrighted works in their entirety.  That AVP has a reasonably priced streaming license, which is ready and available to meet all of UCLA's pedagogical needs, is also not addressed.  Nor is the fact that AVP DVDs contain DRM that is designed to control access and copying, and facilitate AVP's obligations to third parties whose works are used or distributed considered by the Defendants.  Merely asserting that UCLA qualifies for fair use does not satisfy its legal burden to prove its use of each AVP DVD is a fair use.

## II.   THE DEFENDANTS' ACTIONS ARE THE TIP OF AN INFRINGEMENT ICEBERG THAT AFFECT MANY OF AIME'S MEMBER COMPANIES AND REQUIRES DECLARATORY RELIEF

60.   The Defendants' exploitations of AVP copyrights are the proverbial tip of the iceberg.  In response to a lawful request for information by AIME on behalf of its members and pursuant to California Public Records Act, Cal. Gov. Code §6252, *et seq*, the Plaintiffs received a document detailing all the programs that UCLA has streamed in the recent past.  This list contains more than 2,500 program titles, many owned by AIME members.  See Exhibit 13.

61.   A review of this list reveals that the scale of the Defendants' copyright infringing activities is massive.  On information and belief, AIME estimates that at least ten AIME members, in addition to AVP, have nearly 90 titles that the Defendants have authorized for streaming.  All told, in Exhibit 13, there are about 2,500 titles associated with Defendants' copyright infringements.

62.   What the list does not describe, and what UCLA refused to provide AIME in response to the information request, is the number of times each program was streamed.   All the Plaintiffs know from UCLA's acknowledgement to AVP is that 13 AVP DVDs were streamed by UCLA more than 130 times, or in excess of 10 times each.  If a comparable number of streams occurred with regard to other AIME members, then the number of infringements incurred by UCLA against AIME members could exceed 1,000.  Across all works listed in Exhibit 13, the number of infringements could exceed 25,000.   It is for this reason that in addition to the relief

sought by AVP, AIME seeks a declaratory injunction prohibiting the Defendants from engaging in the video streaming practices that infringe the copyrights of AIME members.

63.     AVP and other AIME members license their video catalog to thousands of educational institutions.  If one or more of these institutions follows UCLA's lead and justifies its use of technology like Video Furnace to copy and stream catalogs of AIME member programs, then the potential harm to the copyright interests of AIME members would be magnified enormously.

**COUNT I**
**BREACH OF AVP DVD CONTRACT**

64.     Plaintiffs reallege and incorporate herein the allegations in Paragraphs 1-63.

65.     Plaintiff AVP has duly performed each and every covenant and/or condition of the AVP License.

66.     As described above, the Defendants in their official and individual capacities have a contractual obligation not to copy and stream AVP programs, or to allow, authorize, contribute to or sanction the copying and streaming of AVP programs, but the Defendants have breached that obligation.

67.     Plaintiffs have suffered damages as a direct and proximate result of Defendants' breach, and Defendants are liable to Plaintiff AVP for such breach, including monetary damages, and may be enjoined from future breaches.

## COUNT II
## COPYRIGHT INFRINGEMENT

68.     Plaintiffs reallege and incorporate herein the allegations in Paragraphs 1-67, inclusive.

69.     UCLA copied and streamed 13 AVP DVDs.  These DVDs are original works of authorship.  Registration of each of these programs has been secured.  Evidence of registration of at least one program is attached hereto as Exhibit 12.

70.     At all times relevant hereto, Plaintiff AVP has been and is the exclusive distributor of all copyright rights in and to the AVP DVDs.

71.     Plaintiff AVP licensed copies of the AVP DVDs to UCLA.  Therefore, UCLA had access to Plaintiff's copyrighted programs.

72.     Defendants in their official and individual capacities have copied, or authorized, allowed, contributed to or sanctioned the copying of 13 AVP DVDs and publicly distributed, publicly performed and publicly displayed them by streaming the DVDs more than 130 times.  Defendants copying and streaming are unauthorized by Plaintiff AVP and constitute violations of Plaintiff AVP's exclusive rights to control reproduction, public performance, public distribution and public display of AVP DVDs, all in violation of 17 U.S.C. §106.

73.     Unless enjoined by this Court, Defendants will continue to infringe Plaintiff AVP's copyrights in and relating to AVP DVDs.

74.    Defendants' infringements were willful in that Defendants acted with actual or constructive knowledge that their actions constituted direct and/or contributory infringement and they acted with reckless disregard to Plaintiff AVP's rights.

75.    Plaintiff AVP is entitled to receive all appropriate injunctive relief, including but not limited to the relief available under 17 U.S.C. §§502-503.

76.    Plaintiff AVP is further entitled to recover from the Defendants the damages, including attorneys' fees, it has sustained and will sustain, and any gains, profits and advantages obtained by Defendants as a result of Defendants' willful acts of infringement alleged in this Complaint, including but not limited to such damages and awards as are available under 17 U.S.C. §§ 504-505.

77.    In addition to infringing AVP's copyrights, the Defendants have acknowledged that they had access to and copied and streamed DVDs of ten other AIME members. Each act of copying and streaming constitutes a separate act of willful direct and/or contributory copyright infringement, in violation of the copyright interests of its members, which interests AIME seeks to protect.  The declaratory relief AIME seeks is a preliminary and permanent injunction pursuant to 28 U.S.C. §2201(a) and 2202, prohibiting the Defendants from continuing to engage in such infringing behavior and practices.

/ / /

/ / /

## COUNT III
### VIOLATION OF THE ANTICIRCUMVENTION PROVISIONS OF 17 U.S.C. §1201

78.     Plaintiffs reallege and incorporate herein the allegations in Paragraphs 1-77 inclusive.

79.     By the actions alleged in this Complaint, Defendants in their official and individual capacities have on a direct and/or contributory and/or vicarious basis, circumvented, or allowed, authorized, or sanctioned the circumvention of technological measures that effectively control access to AVP DVDs and those of other AIME members in violation of 17 U.S.C. §1201.

80.     Further, by the actions alleged in this Complaint, Defendants in their official and individual capacities have on a direct and/or contributory and/or vicarious basis acted or allowed, authorized, or sanctioned the action in concert with HV to traffic in technology, products, services, devices, components or parts thereof that are primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to DVDs of AVP and other AIME members, that have only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under copyright law, or is marketed by HV in concert with the Defendants with knowledge for use in circumventing technological measures that effectively control access to works protected under copyright law.

81.     By the actions alleged in this Complaint, Defendants in their official and individual capacities have on a direct and/or contributory and/or vicarious basis acted or allowed, authorized, or sanctioned the action in concert with HV to traffic in technology, products, services, devices, components or parts thereof that are primarily designed or produced for the purpose of circumventing protection afforded to AVP and other AIME members of a technological measure that effectively protects rights of AVP and other AIME members as copyright owners, that have only limited commercially significant purpose or use other than to circumvent protect afforded by a technological measure that effectively protects a right of AVP and other AIME members under copyright law, or is marketed by HV in concert with Defendants with knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of AVP and other AIME members under copyright law, all in violation of 17 U.S.C. §1201.

82.     Defendants' actions were willful in that they acted with actual or constructive knowledge that their actions directly and/or on a contributory or vicarious basis constituted infringement or they acted with reckless disregard to Plaintiffs' rights.

83.     Plaintiffs are entitled to receive all appropriate relief, including but not limited to the damages, injunctive and declaratory relief available under 17 U.S.C. §1203 and under 28 U.S.C. §§2201(a) and 2202.

/ / /

/ / /

### COUNT IV
### BREACH OF THE IMPLIED CONTRACTUAL
### COVENANTS OF GOOD FAITH AND FAIR DEALING

84.    Plaintiffs reallege and incorporate herein the allegations in Paragraphs 1-83 inclusive.

85.    As described above, Defendants in their official and individual capacities have acted or allowed, authorized, or sanctioned the action in bad faith, *inter alia*, by UCLA's gaining access to AVP DVDs and then with knowledge of the AVP DVD License and Ambrose Video 2.0 license that enables streaming of AVP DVDs across the UCLA campus, copied and streamed the AVP DVDs without regard to the AVP DVD License and Ambrose Video 2.0 license.

86.    The conduct described herein constitutes a breach of Defendants implied-in-law covenants of good faith and fair dealing with respect to the AVP DVD License.

87.    By reason of such conduct, Defendants are liable to Plaintiff AVP for general and special compensatory damages and punitive damages.

### COUNT V
### UNJUST ENRICHMENT

88.    Plaintiffs reallege and incorporate herein the allegations in Paragraphs 1- 87 inclusive.

89.    As described above, Defendants obtained access to AVP DVDs and the DVDs of other AIME members.  However, without regard to any license restrictions associated with such access, or copyright law, Defendants copied and streamed or authorized, allowed, contributed to and/or sanctioned the copying and streaming of the

AVP DVDs and DVDs of other AIME members.  As a result, Defendants were able to expand the content offerings to its students, who pay for educational services, which include access to educational content like AVP DVDs and other AIME members.

90.     Defendants enjoyed the benefits of these programs without compliance with copyright law and without paying for the privilege to use them, and thereby the Defendants profited unjustly.   Despite Plaintiffs' demands, Defendants failed, neglected and refused to pay the amounts due and owing to Plaintiff AVP.  As a consequence of Defendants' actions, Plaintiff AVP and other AIME members have been denied financial compensation and credit in connection with exploitation of their DVDs as contemplated by copyright law and/or license agreements, all to UCLA's unjust enrichment.

## COUNT VI
### TORTIOUS INTERFERENCE WITH
### BUSINESS RELATIONSHIPS

91.     Plaintiffs reallege and incorporate herein the allegations in Paragraphs 1- 90 inclusive.

92.     By virtue of Defendants' licensing AVP DVDs, Defendants obtained access to works for which AVP owes a contractual duty to compensate third parties, including the BBC, for certain uses of the DVDs.  Further, as a licensee of the BBC, AVP has an obligation to pursue infringements of the AVP DVDs copyrights and AVP DVD Licenses.

93.    However, with knowledge of and without regard to AVP's business relationship with BBC, utilizing HV's Video Furnace, Defendants in their official and individual capacities have copied and streamed, or authorized, allowed, contributed to or sanctioned the copying and streaming of the AVP DVDs, without any compensation to Plaintiff AVP.  As a result, AVP cannot fully and fairly reimburse BBC for such uses, in derogation of its contractual obligations.

94.    The actions of Defendants were intentional and continued after notice of AVP's obligations and demand to stop.

95.    By reason of such conduct, Defendants have tortiously interfered with AVP's business relationships with BBC and others, causing harm to such relationships.

96.    By reason of such conduct, Defendants are liable to Plaintiff AVP for general and special compensatory damages and punitive damages.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.    Preliminarily and permanently enjoining and restraining Defendants, their officers, directors, shareholders, agents, employees, and attorneys and all those acting in concert with them from:

1.    Infringing the copyrights of AVP and AIME members in any DVD in any manner, including but not limited to reproducing, publicly distributing them, publicly displaying them, or publicly performing them in any medium except as expressly authorized by contract or law;

2.      Circumventing DRM technology designed to limit access to and

copying of AVP and AIME member DVD programs;

B.      Ordering that Defendants file with this Court and serve upon Plaintiffs

within 20 days after the service of such injunction, an affidavit, sworn to under

penalty of perjury, setting forth in detail the manner and form in which Defendants

have complied with such injunction.

C.      Ordering an accounting of all revenues received by Defendants as a result

of their unlawful conduct.

D.      Ordering Defendants to pay all license fees, including interest, due and

owing for the exploitation of AVP's DVDs, in addition to other damages for breach of

contractual obligations and interference with AVP's agreements with third parties,

including the BCC;

E.      Awarding Plaintiffs: 1) Defendants' profits realized as a result of a) the

breach of contract, b) copyright infringement and c) violation of the DMCA; 2)

damages sustained by Plaintiff AVP, including damages arising from Defendants'

intentional and willful conduct under Sections 503 and 1203; and 3) the costs of this

action.

F.      Awarding Plaintiffs statutory damages and attorney's fees pursuant to 17

U.S.C. §§ 504-505.

G.      Awarding Plaintiffs punitive damages in an amount to be determined.

H.     Awarding Plaintiffs prejudgment and post-judgment interest on any

monetary award in this action.

I.     Granting such other and further relief as to this Court deems just and

proper.

DATED:  December 7, 2010

Respectfully Submitted,

James M. Mulcahy (SBN 213547)
jmulcahy@mulcahyllp.com
Kevin A. Adams (SBN 239171)
kadams@mulcahyllp.com
Mulcahy LLP
One Park Plaza
Suite 225
Irvine, California 92614
Telephone No. (949) 252-9377
Fax 949-252-0090

Arnold P. Lutzker, DC Bar No. 101816,
PRO HAC VICE to be applied for
Jeannette M. Carmadella , DC Bar No. 500586,
PRO HAC VICE to be applied for
Lutzker & Lutzker LLP
1233 20th Street, NW
Suite 703
Washington, DC 20036
Telephone No. 202-408-7600 Ext. 1
Fax 202-408-7677
Email: arnie@lutzker.com

*Counsel for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues triable to a jury.

DATED:  December 7, 2010

James M. Mulcahy (SBN 213547)
jmulcahy@mulcahyllp.com
Kevin A. Adams (SBN 239171)
kadams@mulcahyllp.com
Mulcahy LLP
One Park Plaza
Suite 225
Irvine, California 92614
Telephone No. (949) 252-9377
Fax 949-252-0090

Arnold P. Lutzker, DC Bar No. 101816, PRO
HAC VICE to be applied for
Jeannette M. Carmadella , DC Bar No. 500586,
PRO HAC VICE to be applied for
Lutzker & Lutzker LLP
1233 20th Street, NW
Suite 703
Washington, DC 20036
Telephone No. 202-408-7600 Ext. 1
Fax 202-408-7677
Email: arnie@lutzker.com

*Counsel for Plaintiffs*