1  Arnold P. Lutzker, DC Bar No. 101816, admitted PRO HAC VICE
   Jeannette M. Carmadella, DC Bar No. 500586, admitted PRO HAC VICE
2  Allison L. Rapp, MD Bar, PRO HAC VICE to be applied for
   Lutzker & Lutzker LLP
3  1233 20th Street, NW, Suite 703
   Washington, DC 20036
4  Telephone No. 202-408-7600 Ext. 1
   Fax 202-408-7677
5  Email: arnie@lutzker.com

6
   James M. Mulcahy (SBN 213547)
7  jmulcahy@mulcahyllp.com
   Kevin A. Adams (SBN 239171)
8  kadams@mulcahyllp.com
   Mulcahy LLP
9  One Park Plaza, Suite 225
   Irvine, California 92614
10 Telephone No. (949) 252-9377
   Fax 949-252-0090
11
12 ATTORNEYS FOR PLAINTIFFS
13

14              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
15

16 ASSOCIATION FOR INFORMATION            Case No.: CV 10-09378 CBM (MANx)
   MEDIA AND EQUIPMENT, an Illinois
17 nonprofit membership organization; and
   AMBROSE VIDEO PUBLISHING, INC., a     **AMENDED COMPLAINT FOR:**
18 New York corporation,                  **(1) Breach of Written Contract;**
19        Plaintiffs,                      **(2) Anticipatory Breach of**
                                           **     Written Contract**
20        v.                               **(3) Copyright Infringement;**
   THE REGENTS OF THE UNIVERSITY OF        **(4) Declaratory Relief**
21 CALIFORNIA, a California corporation;   **(5) Violation of 17 U.S.C. § 1201;**
   MARK G. YUDOF, an individual; DR.       **(6) Breach of Covenants of Good**
22 GENE BLOCK, CHANCELLOR OF THE           **     Faith and Fair Dealing;**
   UNIVERSITY OF CALIFORNIA, LOS
23 ANGELES, an individual; DR. SHARON      **(7) Unjust Enrichment;**
   FARB, an individual; LARRY LOEHER, an   **(8) Tortious Interference with**
24 individual; PATRICIA O'DONNELL, an      **     Contractual Relations**
25 individual; and John Does 1-50,         **(9) Tortious Interference with**
                                           **     Prospective Business Advantage**
26        Defendants.                      DEMAND FOR JURY TRIAL
27
28

                              1
                      AMENDED COMPLAINT

Association for Information Media and Equipment ("AIME") and Ambrose Video Publishing, Inc ("AVP" or "Ambrose") (collectively, the "Plaintiffs") allege as follows:

## NATURE OF THE ACTION

1.      The Defendants in this case are The Regents of California, ("Regents") in their official capacity as an arm of the State of California governing the University of California at Los Angeles ("UCLA"), and in their individual capacities as members of the Board of Regents; Mark G. Yudof, President of the University of California, in his official and individual capacity ("Mr. Yudof"); Dr. Gene Block, Chancellor of UCLA, in his official and individual capacity (the "UCLA Chancellor"); Dr. Sharon Farb, UCLA's Associate University Librarian for Collection Management and Scholarly Communication, in her official and individual capacity ("Dr. Farb"), Larry Loeher, UCLA's Associate Vice Provost and Director of Instructional Development, in his official and individual capacity ("Mr. Loeher"), and Patricia O'Donnell, Manager of UCLA's Instructional Media Collections and Services and Media Lab, in her official and individual capacity ("Ms. O'Donnell"); and John Does 1-50, who are a) other individuals, presently unknown to Plaintiffs, who have been designated or in the future are designated to replace any of the other named Defendants in their official capacity, and b) any other individuals, who in their official and individual capacities, on a direct or contributory basis, participated in the actions complained of herein (collectively the "Defendants").

2

AMENDED COMPLAINT

2.     The Plaintiffs in this case are AVP, an educational video producer and holder of all exclusive rights associated with the specific copyrighted works in question in this case; and AIME, a national trade association whose public mission is to help ensure copyright education and compliance, and whose membership includes AVP and other video copyright owners and/or exclusive rightsholders.  A list of AIME members is attached hereto as Exhibit 1.

3.     This case involves the Defendants' systematic actions to take copy-protected DVDs, licensed by AVP and other AIME members, and copy, reformat, stream, publicly distribute, publicly display and/or publicly perform these DVDs via the Internet or the UCLA intranet, and to allow faculty and students to copy and perform and/or display these works in flagrant disregard of existing licenses, established copyright law and the Regents' and UCLA's own intellectual property policies.

4.      To accomplish this unlawful activity, upon information and belief, the Defendants utilize Video Furnace, a system manufactured and sold by Hai Vision Systems, Inc. ("HVS").  Video Furnace allows for the unauthorized recording of content and then its delivery as video on demand to computers and set top boxes. According to HVS 2009 publicity, UCLA helped HVS in the design of Video Furnace for use on college campuses and lent its name and reputation to the marketing efforts of HVS, thereby contributing to the trafficking of technology, device, service, device, components or parts thereof, which are capable of facilitating violations throughout

the United States of the copyright rights of AVP and other AIME members, who license programs to these institutions.

5.      As background to the dispute, on information and belief, sometime around January 2006, UCLA's Instructional Media Collections & Services ("IMCS"), which is directly managed and/or supervised by Defendants Dr. Farb, Mr. Loeher and Ms. O'Donnell, and supported by the other Defendants, acquired HVS's Video Furnace system.  With the Video Furnace system, the Defendants began copying programs owned by AVP and licensed to UCLA on a limited license basis, and streamed them on the University's web-based intranet.  In particular, IMCS illegally exploited AVP programs, "The Plays of William Shakespeare," in DVD format ("AVP Shakespeare DVDs").  "The Plays of William Shakespeare" were originally produced by the British Broadcasting Company ("BBC") and Time Life Films, Inc. ("Time").  As a result of the production agreement between BBC and Time, Time acquired exclusive rights to programs in the United States.  Subsequently, Time assigned all its rights in these programs to AVP.  In 2001, AVP created the AVP Shakespeare DVDs.  At all times relevant herein, AVP held and holds on an exclusive basis in the United States all relevant copyright rights pertaining to the AVP Shakespeare DVDs.

6.      On information and belief, utilizing the Video Furnace system, copies of the AVP Shakespeare DVDs were made directly by or under the direction of Defendants Mr. Loeher, Dr. Farb and Ms. O'Donnell, which copies were then converted to digital streams, linked to course web pages and remotely accessed by students and faculty.

4
AMENDED COMPLAINT

1   UCLA told AVP that over a five-year period at least 13 AVP Shakespeare DVDs were

2   copied and streamed more than 130 times to an unspecified number of students and

3   faculty.  Upon information and belief, once students and faculty are authorized to

4

5   access the digital streams, the AVP Shakespeare DVDs can be viewed by system users

6   via the UCLA network, inside or outside an educational setting, inside or outside the

7   United States; that is, wherever the authorized user may be.

8

9   7.      AVP learned about the streaming practice in 2009.  Through AIME, AVP

10  approached the UCLA Chancellor and objected to the practice.  AIME explained that

11  UCLA's streaming practice violated established copyright law.  AVP also explained

12  that streaming was a violation of the AVP Shakespeare DVD license.

13

14  8.      Prior to 2009, AVP had anticipated the need of educational institutions for

15  streaming media.  At substantial effort and expense, AVP developed and currently

16  offers educators Ambrose 2.0, high-quality, reasonably-priced institutional streaming

17  licenses that would enable UCLA to make AVP programs available lawfully.  In fact,

18  Ms. O'Donnell acknowledged to Allen Dohra, AVP Vice President-Sales and

19  President of AIME Board of Directors, that she was aware of Ambrose 2.0 and that it

20  offered a superior video product.  However, she declined to acquire the AVP

21

22  streaming license, indicating that UCLA would continue to rely on the lesser quality

23  streams it already had digitized.  Upon information and belief, the UCLA streams are

24

25  not in compliance with federal disability laws, which require Closed Captions, nor in

26  compliance with UC's Electronic Communications Policy regarding accessibility (*see*

27

28

5
AMENDED COMPLAINT

Par. 19, *infra*).  Ambrose 2.0 is in full compliance with federal disability law requirements.  To the extent that AVP is identified as the source of the UCLA streams that are not in compliance with federal disability laws, AVP's reputation is harmed.

9.      Despite AIME's overtures to the UCLA Chancellor, UCLA was unrelenting. Initially, UCLA claimed absolute entitlement pursuant to two provisions of copyright law; 17 U.S.C. §110(1) (the public performance exemption for "face-to-face" teaching) and 17 U.S.C. §107 (fair use).  It later added reliance upon 17 U.S.C. §110(2) (the public performance exemption for certain digital distance learning uses).

10.     After AVP and AIME confronted the UCLA Chancellor with the prospect of a legal challenge to these theories, on information and belief, UCLA temporarily desisted.  After a winter-break period of reflection, the UCLA Chancellor's Office notified AVP that UCLA had the right to copy the AVP DVDs and to stream the content, so the practice would continue unabated.  Upon information and belief, the practice continues to this day and will continue in the future unless enjoined.

11.     If UCLA and other educational institutions are allowed to license DVDs from AVP and other educational video publishers who are members of AIME, and then copy and stream them to faculty and students without a license and without compensation to the creators, then existing and new markets for AVP's and other AIME member's pre-existing works will be unfairly preempted and the educational video business of AVP and other AIME members will suffer greatly.

12.     Thus, this legal dispute is rooted in a) UCLA's failure to comply with unambiguous provisions of the license pursuant to which the AVP Shakespeare DVD were licensed to UCLA, and b) UCLA's and the Regents' practices, as implemented by and through the Defendants and after notice that these actions were legally indefensible, of intentionally misinterpreting three provisions of copyright law, which provide only narrowly crafted educational use exceptions.  Any limitation in copyright law that is taken too far as the Defendants do, destroys the delicate balance between the policy that inspired its formulation and the intent of copyright law to compensate creators.  This case is about ensuring that the delicate balance is properly respected and not abused.

13.     This case is also about the fair adherence to contractual agreements between UCLA and AVP and other AIME members, who license use of their programs.

PARTIES AND THEIR STANDING

14.     AVP is a New York corporation, whose principal business is the creation and distribution of high quality video content for the educational marketplace.   At all times pertinent to the infringements by the Defendants, AVP held and holds all exclusive rights to all the AVP Shakespeare DVDs in the United States, having acquired those rights from BBC and Time.  Works that the Defendants have copied and streamed in violation of AVP rights are registered with the U.S. Copyright Office in the name of AVP.  AVP licenses its video programs to many schools and colleges throughout the United States, including the State of California and UCLA.

15.     AIME is an Illinois non-profit membership organization offering copyright information and support to teachers, librarians, media center directors, producers and distributors of informational film, video, interactive technologies, computer software and equipment.  AIME's mission is to promote fair and appropriate use of the media and equipment delivering information in a rapidly changing world.  AIME asserts standing to sue in this proceeding as an associational Plaintiff seeking prospective injunctive relief on behalf of its members.  AIME does not seek to remedy any copyright infringement claim that any member may have against UCLA; however, AIME asserts standing because: (1) its members who hold the necessary exclusive rights to their programs have standing to sue on their own for infringement of copyrights, and (2) the copyright interests that AIME seeks to protect are germane to AIME's purpose.  Moreover, neither the claims asserted by AIME, nor the narrow and tailored declaratory relief requested by AIME, requires the participation of individual members in the lawsuit.  AIME only seeks a declaratory ruling that prohibits the Defendants from prospectively infringing the copyrighted works of AIME members who hold all relevant exclusive rights to licensed DVDs, and to prevent copying and streaming of such DVDs without their consent.  To reiterate, AIME is seeking prospective declaratory or injunctive relief only, not monetary damages or other remedies.

16.     AIME also has a personal stake in the outcome of this litigation, suffering injury in fact.  It has suffered from the diversion of its resources to deal with the

8
AMENDED COMPLAINT

Defendants' infringements of AVP's copyrighted works, the potential infringement of other AIME members. AIME members whose works have been digitized and streamed by Defendants include: AVP (37 titles), Bullfrog Films (10 titles), California Newsreel (32 titles), Direct Cinema (9 titles), Film Media Group (1 title), Icarus Films (1 title), Insight Media (2 titles), New Day Films (12 titles), PBS Video (56 titles) and Questar (2 titles). *See* Exhibit 2. AIME has been forced to spend much of its limited resources directly addressing the problem created by the Defendants for the educational video publishers, who are AIME's members and whose membership AIME seeks to maintain. If AIME is unsuccessful in enjoining the way in which the Defendants' exploit educational videos of AIME members by prospective injunctive relief, then the mission of AIME will be materially, if not unalterably, frustrated. Directly as a result of Defendants' activities, AIME thus has been forced to divert its scarce resources away from the mission of information, to the action of prospective enforcement.

17. The Regents is a corporation incorporated under the laws of the State of California, and its power derives from Article IX, Section 9 of the California Constitution. According to its Bylaws, namely Bylaw 5.1(a), the Regents has "full powers of organization and government" subject only to limited legislative control. The Regents is made up of a 26 member board and two nonvoting faculty members. The Regents administers the University of California educational system (sometimes herein "UC") as a public trust, of which UCLA is a member. The present membership

AMENDED COMPLAINT

of The Regents includes the following individuals: 1) Appointed Regents: Richard C. Blum, Jesse Cheng, David Crane, William De La Pena, Russell Gould, Eddie Island, Odessa Johnson, George Kieffer, Sherry L. Lansing, Monica Lozano, Hadi Makarechian, George M. Marcus, Norman J. Pattiz, Bonnie Reiss, Frederick Ruiz, Leslie Tang Schilling, Bruce D. Varner, Paul Wachter and Charlene Zettel; 2) Ex Officio Regents: Jerry Brown, Gavin Newsom, John A. Perez, Tom Torlakson, Mark G. Yudof, Rex Hime and Darek DeFreece; and 3) Faculty Representatives: Dan Simmons and Robert Anderson.

18.     Mark G. Yudof ("Mr. Yudof") is President of the Regents. Pursuant to Regents' Standing Order 100.4(mm), the President of the Regents "is authorized to develop and implement policies and procedures on matters pertaining to intellectual property, including … copyrights … and to execute documents necessary for the administration of intellectual property, including those which may contain commitments existing longer than seven years. The President annually shall report to the Board on matters pertaining to intellectual property."
www.universityofcalifornia.edu/regents/bylaws/so1004.html.

19.     Over the past 25 years, the Regents have adopted and promulgated copyright policies for the entire University of California education system. Principal promulgations of these policies, rules, and criteria are attached hereto as Exhibit 3. Among these policies, rules, orders and criteria, which remain in place today and are enforced by Mr. Yudof, are the following:

a) The mandate that the University of California "uphold[ing] copyright law," www.universityofcalifornia.edu/copyright/usingcopyrighteworks.html;

b) The commitment of the entire UC Community to compliance with applicable intellectual property law, specifically including copyright law. ("The University of California is committed to upholding U.S. copyright law.") www.ucop.edu/irc/policy/copycommit.html);

c) The policy that deems it "vital that *the University of California faculty, students, and staff [to] understand and responsibly exercise rights accorded them under the copyright law*, particularly now in light of new technologies and laws that challenge long-standing educational and library exemptions and interpretations." www.universityofcalifornia.edu/copyright/ (emphasis supplied); and

d)  The University of California Electronic Communications Policy (ECP) that provides:

## II.  GENERAL PROVISIONS
### E. VIOLATIONS OF LAW AND POLICY

**1.  Law.** Federal and state law prohibit the theft or abuse of computers and other electronic resources such as electronic communications resources, systems, and services. Abuses include (but are not limited to) unauthorized entry, use, transfer, tampering with the communications of others, and interference with the work of others and with the operation of electronic communications resources, systems, and services. The law classifies certain types of offenses as felonies (see Appendix B, Reference).

**2. University Disciplinary Actions.** University policy prohibits the use of University property for illegal purposes and for purposes not in support of the mission of the University. In addition to legal sanctions, violators of this Policy may be subject to disciplinary action up to and including dismissal or

expulsion, pursuant to University policies and collective bargaining
agreements. …

**III.  ALLOWABLE USE**
**D.  Allowable Use**
Use of University electronic communications resources is allowable subject
to the following conditions: …
**9. Accessibility.**  All electronic communications intended to accomplish
academic and administrative tasks of the University shall be accessible to
allowable users with disabilities in compliance with law and University
policies. …
**10.Intellectual Property**. *The contents of all electronic communications
shall conform to laws and University policies regarding protection of
intellectual property, including laws and policies regarding copyright,
patents, and trademarks. When the content and distribution of an electronic
communication would exceed fair use as defined by the federal Copyright
Act of 1976, users of University electronic communications resources shall
secure appropriate permission to distribute protected material in any form,
including text, photographic images, audio, video, graphic illustrations, and
computer software. …*
**E. ACCESS RESTRICTION**
*… In compliance with the Digital Millennium Copyright Act*, the University
reserves the right to suspend or terminate use of University electronic
systems and services by any user who *repeatedly violates copyright law*.
www.ucop.edu/ucophome/coordrev/policy/PP081805ECP.pdf.  Emphasis
supplied.

20.    Since 1978, UC has applied for 1,762 copyright registrations with the United

States Copyright Office.  See Exhibit 4.

21.    In addition to the UC system policy, rules and orders, UCLA has issued

copyright policy statements and guidelines that commit UCLA to compliance with

copyright law.  In particular, with respect to audiovisual materials, UCLA copyright

policy states:

> *Audiovisual materials copied in a different format*: Copying audiovisual
> material when change of format results is permitted when the conditions

1          for replacement copying or preservation copying are met *or when*
2          *permission to change the format is granted by the publisher*.
      www.library.ucla.edu/copyright/2141.cfm (emphasis supplied).

3

4    Streaming requires a change in format and the compression of digital files.  Therefore,

5    UCLA requires consent of owners of programming, including AVP, which consent

6    UCLA failed to seek or secure.  UCLA has also issued the following warnings

7    concerning copyright restrictions:

8

9        1) The copyright law of the United States (Title 17, United States Code)
       governs the making of photocopies of other reproductions of
10          copyrighted materials….This institution reserves the right to refuse to
       accept a copying order if, in its judgment, fulfillment of the order
11          would involve violation of Copyright Law.
12          www.library.ucla.edu/copyright/2135.cfm.

13

14       2)  If electronic transmission of reserve material is used for purposes in
       excess of what constitutes "fair use," that user may be liable for
15          copyright infringement. www.library.ucla.edu/copyright/2131.cfm.

16   Exhibit 5.

17   22.    Collectively, the UC and UCLA orders, policies, and actions go well beyond

18   merely discouraging copyright infringement; rather, they constitute an affirmative

19

20   public commitment to "upholding the [copyright] law."  As a result, these orders,

21   policies and actions have brought the UC system, including all the Defendants, within

22   the federal copyright system.  They thus constitute an express waiver of any claim to

23

24   sovereign immunity with respect to Plaintiffs' claims herein.

25   23. Moreover, the Defendants, including the UCLA Chancellor, Dr. Farb, Mr. Loeher

26   and Ms. O'Donnell, have, by virtue of UCLA's agreement to the Terms and

27

28   Conditions set forth in the 2006-2007 AVP License for the AVP Shakespeare DVDs

13
AMENDED COMPLAINT

(the "2006-2007 AVP License") (Exhibit 6) and the Terms and conditions set forth in the 2008-2011 AVP License for other DVDs licensed by UCLA (the "2008-2011 AVP License") (Exhibit 7) (collectively, the 2006-2007 AVP License and the 2008-2011 AVP License, the "AVP Licenses") have expressly waived any claim to sovereign immunity or qualified immunity.  Both the AVP Licenses both expressly provide: "Nothing herein shall derogate from any rights of Ambrose ... under the United States Copyright Law."  (Section 1, 2006-2007 AVP License Exhibit 6, and Section 1, 2008-2011 AVP License Exhibit 7).

24.    Pursuant to Standing Order 100.6 of the Regents, the UCLA Chancellor is "the chief campus officer thereof and shall be the executive head of all activities on that campus ….  The Chancellor shall be responsible for the organization and operation of the campus, its internal administration, and its discipline; and decisions made by the Chancellor in accordance with the provisions of the budget and with policies established by the Board or the President of the University shall be final."  Exhibit 3.  As the chief campus officer, the UCLA Chancellor received correspondence from AVP and AIME, and upon information and belief, instructed his legal counsel, who works within the Office of the Chancellor, and other UCLA staff to respond thereto.

25.    Dr. Farb is the individual responsible for overseeing the activities of the UCLA library system in connection with digital collections management and licensing and copyright management issues.

26.     Mr. Loeher, in his role as Director of the Office of Instructional Development, is responsible for directly supervising Ms. O'Donnell and ensuring that her conduct is consistent with UCLA's objectives and legal policy.

27.     Ms. O'Donnell presides over the IMCS, which is UCLA's primary resource for acquiring educational films, videos and DVDs and for advising faculty members respecting the classroom use of such media.

28.     John Does 1-50 are persons presently unknown to Plaintiffs, who either contributed to the infringements of the AVP Shakespeare DVDs, or who have replaced or will replace the particular individuals identified herein and who thus need to come within the terms of any prospective injunction.

29.     The Regents personally named in Paragraph 15 hereinabove, the UCLA Chancellor, Mr. Yudof, Dr. Farb, Mr. Loeher and Ms. O'Donnell are sued in their individual capacities for directly infringing or contributing to the infringements of AVP's copyrights and violations of AVP's licenses.

                                JURISDICTION AND VENUE

30.     This is a civil action for breach of contract, breach of covenants, anticipatory breach of contract, unjust enrichment and tortious interference with business relationships under common law,  and violation of the Copyright Act of 1976, as amended, 17 U.S.C. §101, *et. seq.* and for declaratory relief.

31.     The Court has personal jurisdiction over the Regents as a corporation incorporated under the laws of California, and over the individual Regents identified

in Paragraph 15 hereinabove, the UCLA Chancellor, Dr. Farb, Mr. Loeher and Ms. O'Donnell, as individuals residing in the State of California.

32.     This Court has subject matter jurisdiction to hear Plaintiff's copyright infringement claim under 17 U.S.C. §101 et seq., 28 U.S.C. §§ 1331 and 1338, supplemental jurisdiction to hear all other claims under 28 U.S.C. §1367, and jurisdiction over declaratory relief requested under 28 U.S.C. §§2201(a) and 2202. Venue is proper under 28 U.S.C. §1391(b) and 28 U.S.C. §1400(a).

FACTS

I. DEFENDANTS INFRINGED AMBROSE'S COPYRIGHTS FOR THE AVP SHAKESPEARE DVDS AND BREACHED THE AVP LICENSES

   A. *The AVP Educational DVD Offerings*

33.     For more than twenty years, AVP has produced and distributed high quality programs in science, history and drama.  Not only has AVP produced award winning programs, but also it has acquired works from third parties, such as the BBC, Discovery Channel and independent producers pursuant to license agreements providing for royalty payments and containing other terms and conditions.  AVP programs are licensed to educational institutions in all digital formats.  DVDs have been available since the year 2000 and Mpeg files in other formats have been available since 2002.  Individual professors and students, as well as institutions, purchase the DVDs.

34.    Many AVP titles feature supplemental educational content, such as concept clips, closed captioning, Spanish subtitles, research guides, maps, timelines, and historical documents using computer graphics, all to enrich the learning experience for students and teachers.   Exhibit 8 is the Ambrose Educational DVD Catalog 2009-2010.

35.    In addition to licensing programs for classrooms and libraries, a number of years ago, AVP made a substantial investment to create Ambrose Video 2.0, a download program and video streaming website (located at www.ambrosedigital.com) that allows educational clients to access more easily the AVP catalog in a number of digital formats.  Given the ever-growing needs of educational institutions to provide varied and flexible content delivery systems for its faculty and student body, Ambrose Video 2.0 has become one of AVP's primary delivery options for educational offerings.   To initiate Ambrose Video 2.0, older video programs, along with newer ones, had to be encoded, captioned and stored.  Then, the technological system to enable efficient real-time delivery had to be developed and implemented.  Ambrose Video 2.0 puts AVP at the forefront of educational video publishers who strive to serve the growing needs and interests of the educational community.  Exhibit 9 consists of pages from the Ambrose Educational DVD Catalog providing further detail on Ambrose Video 2.0.

36.    To meet its obligations to program producers and its own financial needs, AVP has established terms and conditions that control the use of DVD programs.  It

17
AMENDED COMPLAINT

1  licenses schools and universities, including UCLA, the right to use copyrighted

2  programs available in DVD format as set forth in the AVP Licenses.  In connection

3
   with DVDs that AVP has licensed to UCLA since 2006, there are two relevant AVP
4

5  licenses.

6  37.    The terms of the license applicable to Defendants' use of the AVP Shakespeare

7  DVDs are 2006-2007 AVP License.  In addition to all "The Plays of William

8
   Shakespeare," acquired by UCLA in 2006, UCLA also acquired the "Childhood Set"
9

10  DVD series in 2007.  The 2006-2007 AVP License, set forth in Exhibit 6, provides in

11
    pertinent part:
12

13      **1. License:**  Ambrose grants Customer and Customer accepts from Ambrose
        the limited license under copyright to exhibit one or more of the films, video
14      and/or sound filmstrip programs or both ordered or rented by Customer
        (hereinafter called "Programs"), but only for exhibition to non-paying private
15      audiences during the period set forth and in accordance with the specific terms
        of said order or rental....
16

17      CUSTOMER ACKNOWLEDGES THAT THE PROGRAMS MAY NOT BE
18      DUPLICATED, BROADCAST, TRANSMITTED BY CABLE OR
        OTHERWISE, ON ANY MULTI-RECEIVER OPEN OR INTERNET
19      SYSTEM, OR DISPLAYED BEFORE THE PUBLIC, WHETHER OR NOT
        ADMISSION IS CHARGED...
20

21      Customer shall not ... part with possession of any Program received by
22      Customer hereunder.  ... Nothing herein shall derogate from any rights of
        Ambrose or any other copyright proprietor of any Program under the United
23      States Copyright Law....
24

25  38.    In addition to the AVP Shakespeare DVDs and the Childhood Set DVDs,

26  UCLA also licensed another AVP DVD series entitled "Long Search" in 2009.  The

27
    terms of the license applicable to these DVDs are set forth in the 2008-2011 AVP
28

License, set forth on the AVP's website at http://www.ambrosevideo.com/order.cfm. Exhibit 7.

39.     The 2008-2011 AVP License provides in pertinent part:

> **1. Grant of License:** AVP grants to the Licensee a limited, non-exclusive, revocable license to use the Content (as defined below) in an educational OR home video setting.
>
> **CUSTOMER ACKNOWLEDGES THAT THE PROGRAMS MAY NOT BE DUPLICATED, BROADCAST, TRANSMITTED BY CABLE OR OTHERWISE, ON ANY MULTI-RECEIVER OPEN OR INTERNET SYSTEM, OR DISPLAYED BEFORE THE PUBLIC, WHETHER OR NOT ADMISSION IS CHARGED. CUSTOMER SHALL EXHIBIT THE PROGRAMS ONLY AS HEREIN SPECIFIED AND USE THE PROGRAMS FOR NO OTHER PURPOSE.**
>
> Customer shall not sublicense, sublease or part with possession of any Program received by Customer hereunder. Performing rights to music contained in any Program are not granted herein. Nothing herein shall derogate from any rights of Ambrose or any other copyright proprietor of any Program under the United States Copyright Law or any applicable foreign copyright laws. The Content is licensed solely for classroom teaching, research, educational non-commercial multimedia projects, classroom presentations, and individual presentations for use in educational institutions or public libraries.

40.     Both AVP Licenses provide that in the event of default AVP has the right to terminate the license "in addition to and without prejudice to any right or remedy in law or equity or provided for elsewhere in this agreement on account of any violation or breach."

   B.     *Streaming of AVP Shakespeare DVDs*

41.     While UCLA's use of AVP Shakespeare DVDs is subject to the 2006-2007 AVP License, AVP also offers educational institutions the ability to acquire streaming rights to programs via Ambrose Video 2.0.

42.    "Streaming" is the process whereby content is a) copied to conform to the format of a transmitting unit, b) publicly distributed in compressed form over the Internet, c) copied onto the user's computer and d) then publicly displayed by a viewer in real time.  When received by the user, the user does not have wait to download an entire program to begin viewing; rather, the compressed data is decompressed and transmitted from a temporary file to a video display as a continuous "stream" of video files.

43.    To produce the stream, the source (e.g. IMCS) needs a device that copies, conforms the work to a usable digital format and transmits it.  To see the streamed content, the viewer needs a player, which is a special program that receives (copies) the files, decompresses the content, and sends video data to the display screen and audio data to the speakers.

44.    The process of digitally streaming video programs implicates a number of exclusive copyright rights of educational video publishers and exclusive distributors like AVP, including the right to reproduce or copy a work, the right to publicly perform a work, the right to publicly distribute a work and the right to publicly display a work. 17 U.S.C. §106.

45.    When the streamed work is accessed by the viewer, it is displayed on a screen and the contents are performed.  If the screen is in a public place, like a classroom or auditorium, the display and/or performance is "public."  Similarly, if many persons can view the content in different remote locations, like a number of dorm rooms or

AMENDED COMPLAINT

apartments, the copyright law deems such multiple performances "public." 17 U.S.C. §101.

46.     Upon information and belief, a viewer of the AVP Shakespeare DVDs streamed by UCLA does not have to be in an educational setting.  For example, the student with access to the UCLA network can be in a WiFi hot spot anywhere, such as at Starbucks coffee shops off campus.  Upon information and belief, the viewer does not even have to be in the United States.  As long as there is authorized access to the UCLA via the Internet, the program may be performed.  If the streamed content is subject to the 2008-2011 AVP License, then that use would be in violation of the 2008-2011 AVP License, which restricts UCLA's use to educational or home video settings.

47.     As noted, Ambrose Video 2.0 is an affordable video streaming offering for individuals and all kinds of educational institutions, from home schoolers to research institutions of higher education.  Ambrose Video 2.0 has been designed to ensure not only that its programs are made available for use with the newest technological innovations, but also that these uses are consistent with the rights and obligations that AVP owes third parties, like the BBC, music authors, screenwriters, photographers and others whose works are distributed or incorporated into AVP programs.  Ambrose Video 2.0 thus incorporates Digital Rights Management ("DRM"), or technological measures designed to control access to and copying of the DVDs.

48.     The pricing of AVP streaming rights to video programs is tailored to every institutional need.  For example, a license for an unlimited simultaneous stream of the

AMENDED COMPLAINT

AVP Shakespeare DVD "Measure for Measure," with closed captioning to all students and faculty served by the UCLA Los Angeles campus for one year can be acquired for $24.99.  AVP bundles up to 50 hours of programming for $889.00.  *See* Exhibit 9.  Lower priced options are available for home schools and individual teachers.

C.    *UCLA's Breach of Contract and Copyright Infringements*

49.    Pursuant to the 2006-2007 AVP License, UCLA licensed (a) AVP Shakespeare DVDs consisting of 37 DVDs, the entire series, "The Plays of William Shakespeare" in 2006; and (b) "Childhood Set" in 2007.  The AVP Shakespeare DVDs are among AVP's most popular offerings.  Pursuant to the 2008-2011 AVP License, UCLA acquired AVP's DVD series "Long Search."  AVP holds all pertinent exclusive copyright rights to all these works in the United States.

50.    Given the license restrictions on streaming AVP videos and the reasonableness of the Ambrose Video 2.0 streaming license, it came as a rude shock when AVP learned that IMCS had been streaming AVP programs for years without prior request, approval, or any effort on their part to ascertain whether such a license was deemed necessary or available.

51.    At the time of this infringement discovery and aware that UCLA's actions could affect many other, similarly-situated educational video publishers, AVP enlisted the support of AIME.  On May 19, 2009, Betty G. Ehlinger, Executive Director of AIME, wrote Ross Bollens, Director of Information Technology Security of UCLA's

Office of Information Technology, regarding the revelation by Ms. O'Donnell that she had been utilizing Video Furnace to copy, digitize and stream AVP Shakespeare DVDs for many years. Exhibit 10. Writing on behalf of AVP, Ms. Ehlinger advised Mr. Bollens that this practice violated copyright law and sought an accounting of the activities and assurance of future compliance with licenses and the law.

52.     Mr. Bollens did not respond, so on June 18, 2009, Ms. Ehlinger wrote to the UCLA Chancellor. Exhibit 11. On July 24, 2009, L. Amy Blum, Senior Campus Counsel in the Office of the Chancellor, responded to both of Ms. Ehlinger's letters. Exhibit 12. In her response, Ms. Blum set forth legal defenses for UCLA's digitizing and streaming practices, citing Sections 107 and 110(1) of the Copyright Act. 17 U.S.C. §§107 and 110(1).

53.     On September 16, 2009, Arnold P. Lutzker, Counsel for AIME, replied to Ms. Blum's analysis, in which he contested both prongs of UCLA's defense, indicating that neither Section 107 nor Section 110(1) authorized or allowed the UCLA practices. Exhibit 13. Mr. Lutzker urged that the parties should meet to see if a resolution of the dispute was feasible, but that before such meeting, UCLA should provide more details regarding digitizing and streaming of AIME member programs.

54.     On October 21, 2009, UCLA responded, indicating that it would meet with AIME and that IMCS would temporarily stop streaming content outside the Library commencing December 20, 2009. Exhibit 14. In her response, Ms. Blum sought to

1    narrow UCLA's liability, but that suggestion was rejected by letter dated October 28,

2    2009.  Exhibit 15.

3
     55.    A meeting of the parties was held on January 19, 2010.  Mr. Dohra represented
4
5    AVP and AIME, and Dr. Farb, Ms. O'Donnell and Mr. Loeher represented UCLA.

6    The meeting did not resolve the dispute.

7
     56.    On information and belief, by public pronouncement and by letter dated March
8
9    2, 2010, UCLA publicly announced and advised AVP that it would resume copying

10   and streaming DVDs from its libraries, adding Section 110(2), 17 U.S.C. §110(2), as

11
     an additional justification for its practice, and indicating that it would require
12
13   professors to articulate a pedagogical purpose for any streaming request.  Exhibit 16.

14       D.    UCLA's Actions Violate the Copyright Law Including the DMCA

15
     57.    On information and belief, UCLA uses HVS's Video Furnace to copy,
16
17   distribute, perform and display AVP Shakespeare DVDs, all in violation of AVP's

18   exclusive copyright rights and in breach of the covenants in the 2006-2007 AVP

19
     License.
20
21   58.    On information and belief, the making of copies of AVP Shakespeare DVDs

22   utilizing Video Furnace also entails the bypassing of copy-guarded codes embedded

23
     within each AVP Shakespeare DVD.  Copy-guarded codes are an integral part of
24
25   AVP's Digital Rights Management ("DRM") system, or technological measures that

26   AVP employs to prevent unauthorized access, copying and use of AVP Shakespeare

27
     DVDs.  Such codes are a key mechanism not only for implementing the license
28

                                    24
                           AMENDED COMPLAINT

restrictions in the 2006-2007 AVP License, as well as the 2008-2011 AVP License, but also for assuring compliance with AVP's obligations to third parties, whose programs it distributes or works it incorporates within AVP DVDs.

59.     On information and belief, the circumvention of AVP's DRM constitutes violations of Sections 1201(a) and (b) of the Copyright Act.  17 U.S.C. §1201(a) and (b).  On information and belief, the Defendants are liable in their individual and official capacities for UCLA's actions to circumvent AVP's technological measures that effectively control access to and copying of its programs.

60.     On information and belief, UCLA worked in close coordination with HVS and a few other universities, to develop Video Furnace applications for use by higher education.  According to statements that have appeared on HVS's website:

> HaiVision's Video Furnace is the premier package for end-to-end delivery of content for higher education and K-12 institutions. Video Furnace is ideal for delivering cable content in dormitories and across the campus, for providing video-on-demand content for use within classes and by students at their leisure, for launching campus TV stations, for making special classes or events available to everyone, and for recording classes and events for later review. … *Video Furnace was initially developed in close collaboration with a number of leading universities including Northwestern, Dartmouth, and UCLA.* http://www.haivision.com/applications/education (accessed September 13, 2009.)  Emphasis supplied.

61.     On information and belief, based on its direct assistance to HVS and their willingness to lend their name and reputation to the marketing efforts of HVS, Defendants have trafficked in Video Furnace, which is a technology, product, service, device, component, or part thereof, that (A) is primarily designed or produced for the

purpose of circumventing a technological measure that effectively controls access to a work protected under this title; (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; and (C) has been marketed by HVS in concert with UCLA with knowledge of its use in circumventing a technological measure that effectively controls access to a work protected under copyright law, in violation of 17 U.S.C. §1201(a).

62.     On information and belief, UCLA acted in concert with HVS in the development of Video Furnace, with knowledge that Video Furnace can be used to circumvent technological measures, like those employed by AVP on AVP Shakespeare DVDs, to limit access to its copyrighted DVDs, in violation of 17 U.S.C. §1201(a).

63.     On information and belief, based on its direct assistance to HVS and their willingness to lend their name and reputation to the marketing efforts of HVS, Defendants have trafficked in Video Furnace, a technology, product, service, device, component, or part thereof, that (A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; (B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; and (C) has been

1   marketed by HVS in concert with UCLA with knowledge of its use in circumventing

2   protection afforded by a technological measure that effectively protects a right of a

3
    copyright owner under this title, in violation of 17 U.S.C. §1201(b).
4

5   64.    On information and belief, UCLA acted in concert with HVS in the

6   development of Video Furnace, with knowledge that Video Furnace can be used to

7
    circumvent protection afforded by a technological measure that effectively protects a
8

9   right of a copyright owner under copyright law, like the copy-guard DRM employed

10  by AVP on AVP DVDs, in violation of 17 U.S.C. §1201(b).

11
        *E. None of the Copyright Defenses Asserted by Defendants Supports Their*
12  *Infringing Actions*

13
    65.    AVP has registered the AVP Shakespeare DVDs exploited by UCLA with the
14

15  U.S. Copyright Office.  Copies of the Registration Certificates for AVP Shakespeare

16  DVDs are attached hereto.  Exhibit 17.

17
    66.    Contrary to the Defendants' assertions, Section 110(1), 17 U.S.C. §110(1), does
18

19  not sanction UCLA's copying and streaming of AVP Shakespeare DVDs.  Section

20  110(1) only permits the public performance or public display of copyrighted works in

21
    the course of face-to-face teaching activities of instructors and students of non-profit
22

23  educational institutions in classrooms or similar places of teaching.  Moreover,

24  Section 110(1) does not exempt the copying of any work, which is done each time the

25
    Defendants prepare a work for streaming using Video Furnace, nor does it exempt
26

27  distribution of video programming from a remote location (like UCLA's media

28

center), nor does it permit performance in places that are not similar to classrooms, such as dormitories, apartments, commercial venues where WiFi is present, or to auditoriums where the audience is not confined to a particular academic class.

67.     Section 110(1) also intends that viewing be simultaneous between teacher and students in order for the face to face teaching exception to apply.  Since the streaming activities by UCLA allow students and faculty to view the copyrighted material at any time and at different times from each other, the uses do not fall under Section 110(1).

68.     Further, Section 110(1) only authorizes the performance of a motion picture from a copy that was lawfully made.  Since the streaming was effectuated using an unauthorized copy of a licensed DVD, which expressly prohibits copying, the use of the unlawful copy places this activity outside the scope of Section 110(1).

69.     Contrary to the Defendants' assertion, Section 110(2), 17 U.S.C. §110(2), does not sanction UCLA's copying and streaming of AVP Shakespeare DVDs.  Section 110(2), also known as The TEACH Act, is a limited exemption designed to allow use of certain copyrighted materials in the context of digital distance education.  Most pertinent for purposes of this case is the fact that the statute excludes works, such as AVP Shakespeare DVDs, which are separately marketed for licensed streaming for use in classrooms as part of "mediated instructional activities" as defined under copyright law.  Section 110(2) expressly provides that the exception is inapplicable to works "produced or marketed primarily for performance or display as part of mediated

instructional activities transmitted via digital networks."  With the development of Ambrose 2.0, the AVP Shakespeare DVDs qualify as such works.

70.   Equally significant, with respect to motion pictures, the statute is very clear: only "reasonable and limited portions" can be exploited, not entire programs as UCLA has done. 17 U.S.C. §110(2).

71.   Finally, as with Section 110(1), use of an unlawful copy voids any claim to entitlement.  Defendants' making of unauthorized copies utilizing Video Furnace bars reliance upon the Section 110(2) limitation on liability for public performance and public display.

72.   Contrary to Defendants' assertions, Section 107, 17 U.S.C. §107, does not sanction Defendants' copying and streaming of AVP Shakespeare DVDs.  Section 107, copyright law's "fair use" provision, is a defense to a claim of infringement based upon a factual analysis of four statutory criteria.  This means that although an unauthorized use or infringement has occurred, based upon an assessment of the fair use criteria applied to the facts associated with the specific infringement, the use may be allowed, even without the copyright owner's consent.  Since fair use requires a balancing of the four criteria, no judgment can be reached without the four factors being fully assessed.

73.   In other words, fair use is not a blanket right to copy and stream AVP Shakespeare DVDs; rather, the statutory limitation requires a factual evaluation based on the four criteria, applied to specific facts and specific works.  Therefore, UCLA

cannot simply claim, as Defendants have, that fair use broadly exempts it from liability and that it allows it to copy, stream and publicly perform any AVP Shakespeare DVD it chooses.  Rather, fair use requires an evaluation of the relevant facts applicable to each use of each work to determine if the fair use defense is applicable.

74.     In this instance, Defendants have chosen to ignore the fact that UCLA acquired the AVP Shakespeare DVDs pursuant to the 2006-2007 AVP License that expressly grants only a limited license to exhibit the videos to non-paying audiences, while prohibiting duplication and transmission "on any multi-receiver open or internet system."

75.     Further, Defendants covenant in the AVP Licenses that "Nothing herein shall derogate from any rights of Ambrose or any other copyright proprietor of any Program under the United States Copyright Law or any applicable foreign copyright laws."

76.     In addition, on information and belief, UCLA has not sought to exploit "reasonable and limited portions" of particular AVP Shakespeare DVDs, but rather has decided to exploit the copyrighted works in their entirety.  That AVP has a reasonably priced streaming license, which is ready and available to meet all of UCLA's pedagogical needs, is also not considered.  The fact that AVP Shakespeare DVDs contain DRM that is designed to control access and copying, and facilitate AVP's obligations to third parties whose works are used or distributed, is similarly

30
AMENDED COMPLAINT

1    ignored by the Defendants.  Merely asserting that UCLA qualifies for fair use does not

2    satisfy its legal burden to prove its repeated use of each AVP Shakespeare DVD is a

3    fair use.

4

5    II.    THE DEFENDANTS' ACTIONS ARE THE TIP OF AN INFRINGEMENT
        ICEBERG THAT AFFECT OTHER AIME MEMBER COMPANIES AND

6       REQUIRES DECLARATORY RELIEF

7    77.    The Defendants' exploitations of AVP Shakespeare DVDs are the proverbial tip

8

9    of the iceberg.  In response to a lawful request for information by AIME on behalf of

10   its members and pursuant to California Public Records Act, Cal. Gov. Code §6252, *et*

11   *seq*, the Plaintiffs received a document detailing all the programs that UCLA has

12   streamed in the recent past.  This list contains more than 2,500 program titles, many

13

14   owned by AIME members.  Exhibit 2.

15   78.    A review of this list reveals that the scale of the Defendants' copyright

16

17   infringing activities is massive.  Ten AIME members, including AVP, have 162 titles

18   on the list that the Defendants have copied and streamed.

19   79.    What Exhibit 2 does not specify and what UCLA refused to provide AIME in

20

21   response to the information request, is the number of times each program was

22   streamed.   All AIME knows from UCLA's acknowledgement to AVP is that 13 AVP

23   DVDs were streamed by UCLA more than 130 times, or in excess of 10 times each.

24

25   If a comparable number of streams occurred with regard to other AIME members,

26   then the number of infringements against AIME members could exceed 1,100.

27

28   Whether such streaming activity constitutes infringement of AIME members

31
AMENDED COMPLAINT

copyrights is for them to pursue individually.  However, given the known infringement of AVP's works, the presence of AIME members on the streaming list, and the Defendants' stated determination to continue their massive streaming activities, it is for these reasons that AIME seeks a prospective, declaratory injunction prohibiting the Defendants from engaging in future copying and streaming of content licensed from AIME members (*see* Exhibit 1) without the Defendants first obtaining consent directly from the affected AIME members.

80.     AVP and other AIME members license their video catalog to thousands of educational institutions.  If UCLA's actions in assisting in the development of Video Furnace and lending its reputation to HVS's marketing of Video Furnace influenced other institutions to purchase Video Furnace, then the huge catalog of UCLA streamed titles could similarly influence other educational institutions to copy and stream their catalogs, which are likely to include AIME member programs.  In such event, the prospective harm to the copyright interests of AIME and AIME members could be magnified enormously.

## COUNT I
### BREACH OF 2006-2007 AVP LICENSE

81.     AVP realleges and incorporates herein the allegations in Paragraphs 1-80.

82.     Plaintiff AVP has duly performed each and every covenant and/or condition of the 2006-2007 AVP License.

83.   As described above, the Defendants in their official and individual capacities have breached numerous covenants contained in the 2006-2007 AVP License, including the following:

a. the limited license from Ambrose for the Program "in 16mm film, DVD or video cassette type ordered;"

b. the term that prohibits duplication, broadcast, transmission on any multi-receiver open or internet system;

c. the covenant that Ambrose's rights under U.S. copyright law will not be derogated;

d. the default provision allowing AVP to repossess the AVP Shakespeare DVDs;

e. the use requirement that each Program shall be exhibited only in its entirety and that licensees "shall not copy, duplicate, sublicense or sublease or part with possession thereof;"

f. the covenant limiting the exhibition of the AVP programs to "non-paying private audiences," since by providing students with passwords to view the streamed programs, Defendants have surrendered the ability to control who can view the programs and in what setting; and

g. the covenant requiring that no program can "be performed or exhibited without complete copyright notices and credits contained therein," since by the nature of Internet streaming, the end credits cannot be performed until the program has been seen in its entirety, which Defendants cannot ensure.

84.     Plaintiffs have suffered damages as a direct and proximate result of Defendants' breaches of contractual covenants, and Defendants are liable to Plaintiff AVP for such breaches, including monetary damages, payment of maximum attorneys permitted by law, return of the AVP Shakespeare DVDs, and may be prospectively enjoined from future breaches.

**COUNT II**
**ANTICIPATORY BREACH OF 2008-2011 AVP LICENSE**

85.     AVP realleges and incorporates herein the allegations in Paragraphs 1-84.

86.     Plaintiff AVP has duly performed each and every covenant and/or condition of the 2008-2011 AVP License.

87.     UCLA has clearly communicated to Plaintiffs its intention to continue streaming DVDs by Ambrose, including DVDs licensed under the 2008-2011 AVP License, which intention is without justification, thereby repudiating the following obligations under that license:

    a.  the term that prohibits duplication, broadcast, transmission on any multi-receiver open or internet system;

    b.  the covenant that Ambrose's rights under U.S. copyright law will not be derogated;

    c.  the default provision by refusing to allow AVP to repossess the DVDs;

    d.  the requirement that the licensee shall not sublicense or sublease or part with possession of any Program;

34
AMENDED COMPLAINT

e.   the covenant requiring that no program can "be performed or exhibited without complete copyright notices and credits contained therein," since by the nature of Internet streaming, the end credits cannot be viewed unless the program has been seen in its entirety;

f.   the provision that the Content can be used only "in an educational OR home video setting," since faculty and students who have been provided with passwords will be able to view the streamed programs outside a home or educational setting;

g.   the covenant prohibiting use of Plaintiff AVP's trademarks that appear on its website "without express written consent," since the streamed AVP programs contain Plaintiff AVP's logos without its consent; and

h.   the express and/or implied covenant that UCLA will pay a higher price for streaming rights.

88.   Such communications by UCLA constitute anticipatory breaches of its obligations under the 2008-2011 AVP License.

89.   Plaintiffs have suffered damages as a direct and proximate result of Defendants' anticipatory breaches of contractual covenants, and Defendants are liable to Plaintiff AVP for such breaches, including monetary damages, payment of maximum attorneys permitted by law, return of the AVP DVDs, and may be prospectively enjoined from future breaches.

AMENDED COMPLAINT

## COUNT III
## COPYRIGHT INFRINGEMENT

90.    AVP realleges and incorporates herein the allegations in Paragraphs 1-89, inclusive.

91.    Defendants Ms. O'Donnell, Dr. Farb and Mr. Loeher had access to and directly copied and streamed, or authorized the copying and streaming of the AVP Shakespeare DVDs on the UCLA intranet or internet service for faculty and students. All other Defendants contributed to her or their infringements as set forth herein. AVP Shakespeare DVDs are original works of authorship, registered with the U.S. Copyright Office.  Evidence of registration of numerous programs is attached hereto as Exhibit 17.

92.    At all times relevant hereto, Plaintiff AVP has been and is the owner of all pertinent exclusive copyright rights in and to the AVP Shakespeare DVDs and all other DVDs licensed to the Defendants.

93.    Defendants in their official and individual capacities have copied, or authorized, allowed, contributed to or sanctioned the copying of AVP DVDs and publicly distributed, publicly performed and publicly displayed them by streaming the AVP Shakespeare DVDs more than 130 times.

94.    Defendants' copying and streaming are unauthorized by Plaintiff AVP and constitute violations of Plaintiff AVP's exclusive rights to control reproduction, public performance, public distribution and public display of AVP Shakespeare DVDs, all in violation of 17 U.S.C. §106.

AMENDED COMPLAINT

95.    Unless prospectively enjoined by this Court, Defendants will continue to infringe Plaintiff AVP's copyrights in and relating to the AVP Shakespeare DVDs and other AVP DVDs licensed to UCLA.

96.    Defendants' infringements were willful in that Defendants acted with actual or constructive knowledge that their actions constituted direct and/or contributory infringement and they acted with reckless disregard to Plaintiff AVP's rights.

97.    Plaintiff AVP is entitled to receive all appropriate injunctive relief, including but not limited to prospective injunctive relief, a return of all AVP Shakespeare DVDs, destruction of all digital files made from the AVP Shakespeare DVDs, and all other relief available under 17 U.S.C. §§502-503.

98.    Plaintiff AVP is further entitled to recover from the Defendants the damages, including attorneys' fees, it has sustained and will sustain, and any gains, profits and advantages obtained by Defendants as a result of Defendants' willful acts of infringement alleged in this Complaint, including but not limited to such damages and awards as are available under 17 U.S.C. §§ 504-505.

## COUNT IV
## DECLARATORY RELIEF IN FAVOR OF PLAINTIFF AIME

99.    AIME realleges and incorporates herein the allegations in Paragraphs 1-98, inclusive.

100.   AIME, in its capacity as an associational Plaintiff, seeks prospective injunctive relief to prevent the Defendants from engaging in future copying and streaming practices that will violate the rights of AIME members.

101.   Each prospective act of copying and streaming that constitutes willful direct and/or contributory copyright infringement violates the copyright interests of AIME members, which interests AIME seeks to protect.  The declaratory relief AIME seeks is a permanent injunction pursuant to 28 U.S.C. §2201(a) and 2202, prohibiting the Defendants from engaging in future copying and streaming of content licensed from AIME members (*see* Exhibit 1) without the Defendants' first obtaining consent directly from the affected AIME member.

## COUNT V
## VIOLATION OF THE ANTICIRCUMVENTION
## PROVISIONS OF 17 U.S.C. §1201

102.   AVP realleges and incorporates herein the allegations in Paragraphs 1-101 inclusive.

103.   By the actions alleged in this Complaint, Defendants in their official and individual capacities have on a direct and/or contributory and/or vicarious basis, circumvented, or allowed, authorized, or sanctioned the circumvention of technological measures that effectively control access to AVP Shakespeare DVDs in violation of 17 U.S.C. §1201.

104.   Further, by the actions alleged in this Complaint, Defendants in their official and individual capacities have on a direct and/or contributory and/or vicarious basis

acted or allowed, authorized, or sanctioned the action in concert with HVS to traffic in

technology, products, services, devices, components or parts thereof that are primarily

designed or produced for the purpose of circumventing a technological measure that

effectively controls access to AVP Shakespeare DVDs, that have only limited

commercially significant purpose or use other than to circumvent a technological

measure that effectively controls access to a work protected under copyright law, and

that has been marketed by HVS in concert with the Defendants with knowledge for

use in circumventing technological measures that effectively control access to works

protected under copyright law.

105.   By the actions described in this Complaint, Defendants in their official and

individual capacities have on a direct and/or contributory and/or vicarious basis acted

or allowed, authorized, or sanctioned the action in concert with HVS to traffic in

technology, products, services, devices, components or parts thereof that are primarily

designed or produced for the purpose of circumventing protection afforded to AVP of

a technological measure that effectively protects rights of AVP as copyright owner or

the owner of all exclusive rights in copyrighted works, that have only limited

commercially significant purpose or use other than to circumvent protections afforded

by a technological measure that effectively protects a right of AVP under copyright

law, and that has been marketed by HVS in concert with Defendants with knowledge

for use in circumventing protection afforded by a technological measure that

effectively protects a right of AVP under copyright law, all in violation of 17 U.S.C. §1201.

106.    Defendants' actions were willful in that they acted with actual or constructive knowledge that their actions directly and/or on a contributory or vicarious basis constituted infringement or they acted with reckless disregard to AVP's rights.

107.    AVP is entitled to receive all appropriate relief, including but not limited to the damages, injunctive and declaratory relief available under 17 U.S.C. §1203 and under 28 U.S.C. §§2201(a) and 2202.

## COUNT VI
### BREACH OF THE IMPLIED CONTRACTUAL COVENANTS OF GOOD FAITH AND FAIR DEALING

108.    AVP realleges and incorporates herein the allegations in Paragraphs 1-107 inclusive.

109.    As described above, Defendants in their official and individual capacities have acted or allowed, authorized, or sanctioned the action in bad faith, *inter alia*, by causing UCLA to breach various contractual covenants contained in the 2006-2007 AVP License and to anticipate the breach of the 2008-2011 AVP License.

110.    The Defendants have also publicly distributed copies of the AVP Shakespeare DVDs without Closed Captioning as required by law and UC policies.

111.    The conduct described herein constitutes a breaches and anticipatory breaches of Defendants implied-in-law covenants of good faith and fair dealing with respect to

1   the AVP Licenses, and violations of the orders, policies and commitments of UC and

2   UCLA made pursuant to public pronouncements and relied upon by the AVP.

3   112.   By reason of such conduct, Defendants are liable to Plaintiff AVP for general

4

5   and special compensatory damages and punitive damages.

6                                    **COUNT VII**

7                              **UNJUST ENRICHMENT**

8   113.   AVP realleges and incorporates herein the allegations in Paragraphs 1- 112

9   inclusive.

10

11  114.   As described above, Defendants' illegal actions have enabled them to expand

12  their content offerings to its students, who pay for educational services, and resources

13  for faculty, which include access to educational content like AVP Shakespeare DVDs.

14

15  115.   Defendants enjoyed the benefits of these programs without paying for the

16  privilege to use them, and thereby the Defendants profited unjustly.   Despite

17  Plaintiffs' demands, Defendants failed, neglected and refused to pay the amounts due

18

19  and owing to Plaintiff AVP.  As a consequence of Defendants' actions, Plaintiff AVP

20  has been denied financial compensation and credit in connection with exploitation of

21  their DVDs as contemplated by the AVP Licenses, all to UCLA's unjust enrichment.

22

23                                   **COUNT VIII**

24              **TORTIOUS INTERFERENCE WITH**
                       **CONTRACTUAL RELATIONS**
25

26  116.   AVP realleges and incorporates herein the allegations in Paragraphs 1- 115

27  inclusive.

28

117.   By virtue of Defendants' licensing AVP Shakespeare DVDs, Defendants obtained access to works for which AVP owes a contractual duty to compensate third parties, including the BBC, for certain uses of the DVDs.  Further, pursuant to agreements with the BBC, AVP has an obligation to pursue infringements of the AVP Shakespeare DVDs copyrights and AVP Licenses.

118.   However, with knowledge of and without regard to AVP's business relationship with the BBC, utilizing HVS's Video Furnace, Defendants in their official and individual capacities have interfered with AVP's contractual obligations to the BBC and the BBC's contractual obligations to third parties by, inter alia.

   a.  Making it impossible for AVP to fulfill its payment and audit obligations to the BBC;

   b.  Causing AVP and the BBC to breach contractual obligations to guilds and other parties involved in the exploitation of the AVP Shakespeare DVDs; and

   c.  Causing AVP to breach its agreement with the BBC, pursuant to which AVP acquired exclusive rights to the BBC's "The Plays of William Shakespeare" only in the United States and U.S. territories, because Defendants have no control over where faculty and students may stream and/or view programs.

119.   The actions of Defendants were intentional and continued after notice of AVP's obligations and demand to stop.

120.   By reason of such conduct, Defendants have tortiously interfered with AVP's contractual relationships with the BBC and others, and their contractual relationships

1    with other parties, causing harm to such relationships and rendering Plaintiff AVP

2    potentially liable to claims from such third parties.

3    121.   By reason of such conduct, Defendants are liable to Plaintiff AVP for general

4

5    and special compensatory damages and punitive damages.

6

### COUNT IX
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

7

8

9    122.   AVP realleges and incorporates herein the allegations in Paragraphs 1- 121

10

11   inclusive.

12   123.   A significant part of AVP's revenue comes from the sale of its DVD products at

13   affordable prices to professors and students.

14

15   124.   By UCLA's streaming of AVP Shakespeare DVDs to faculty and students, in

16   violation of the 2006-2007 AVP License, UCLA is depriving Plaintiffs of this huge

17   marketplace, since the professors and students can now obtain the products free via

18

19   streaming and no longer have any incentive to purchase them.

20   125.   Defendants had knowledge of AVP's practice of selling DVDs to professors

21   and students.

22

23   126.   The actions of Defendants were intentional and continued after notice of AVP's

24   obligations and demand to stop.

25   127.   By reason of such conduct, Defendants have tortiously interfered with AVP's

26   prospective business advantage.

27

28

AMENDED COMPLAINT

128.   By reason of such conduct, Defendants are liable to Plaintiff AVP for general and special compensatory damages and punitive damages.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.   Permanently enjoining and restraining Defendants, their officers, directors, shareholders, agents, employees, and attorneys and all those acting in concert with them from:

1.   Infringing the copyrights of AVP in the AVP Shakespeare DVDs and any other AVP DVD in any manner, including but not limited to reproducing, publicly distributing them, publicly displaying them, or publicly performing them in any medium except as expressly authorized by contract or law;

2.   Circumventing DRM technology designed to limit access to and copying of AVP DVD programs; and

3.   Prospectively infringing the copyrights of AIME members, who have licensed or will license DVD programs to UCLA, by copying and streaming such DVD content without the consent of AIME members.

B.   Ordering that Defendants to file with this Court and serve upon Plaintiffs within 20 days after the service of such injunction, an affidavit, sworn to under penalty of perjury, setting forth in detail the manner and form in which Defendants have complied with such injunction.

C.     Ordering an accounting of all revenues received by Defendants as a result of their unlawful conduct.

D.     Ordering Defendants to pay all license fees, including interest, due and owing for the exploitation of AVP Shakespeare DVDs, maximum attorney fees permitted by law, and other damages for breach of contractual obligations and interference with AVP's agreements with third parties, including the BCC;

E.     Awarding AVP:  1) Defendants' profits realized as a result of a) the breach of contract, b) copyright infringement, c) violation of the DMCA and d) unjust enrichment; 2) damages sustained by Plaintiff AVP, including damages arising from Defendants' intentional and willful conduct under Sections 503 and 1203; and 3) the costs of this action.

F.     Awarding AVP statutory damages and attorney's fees pursuant to 17 U.S.C. §§ 504-505.

G.     Awarding AVP punitive damages in an amount to be determined.

H.     Awarding AVP prejudgment and post-judgment interest on any monetary award in this action.

I.     Granting such other and further relief as to this Court deems just and proper.

DATED:  February 14, 2011

Respectfully Submitted,

AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

James M. Mulcahy (SBN 213547)
jmulcahy@mulcahyllp.com
Kevin A. Adams (SBN 239171)
kadams@mulcahyllp.com
Mulcahy LLP
One Park Plaza
Suite 225
Irvine, California 92614
Telephone No. (949) 252-9377
Fax 949-252-0090

Arnold P. Lutzker, DC Bar No. 101816,
Admitted PRO HAC VICE
Jeannette M. Carmadella , DC Bar No. 500586,
Admitted PRO HAC VICE
Allison L. Rapp, Member MD Bar
PRO HAC VICE to be applied for
Lutzker & Lutzker LLP
1233 20th Street, NW
Suite 703
Washington, DC 20036
Telephone No. 202-408-7600 Ext. 1
Fax 202-408-7677
Email: arnie@lutzker.com

*Counsel for Plaintiffs*

AMENDED COMPLAINT

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all issues triable to a jury.

DATED:  February 14, 2011

_____

James M. Mulcahy (SBN 213547)
jmulcahy@mulcahyllp.com
Kevin A. Adams (SBN 239171)
kadams@mulcahyllp.com
Mulcahy LLP
One Park Plaza
Suite 225
Irvine, California 92614
Telephone No. (949) 252-9377
Fax 949-252-0090

Arnold P. Lutzker, DC Bar No. 101816,
admitted PRO HAC VICE
Jeannette M. Carmadella, DC Bar No. 500586,
admitted PRO HAC VICE
Allison L.Rapp, Member MD Bar, PRO HAC
VICE to be applied for
Lutzker & Lutzker LLP
1233 20th Street, NW
Suite 703
Washington, DC 20036
Telephone No. 202-408-7600 Ext. 1
Fax 202-408-7677
Email: arnie@lutzker.com

*Counsel for Plaintiffs*

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address 1 Park Plaza, Suite 225, Irvine, CA  92614.

On **February 14, 2011**, I served document(s) described as **AMENDED COMPLAINT** on the following person at the addresses and/or facsimile number below:

R. James Slaughter
Michael S. Kwun
Andrew F. Dawson
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA  94111-1704

[ ]   VIA FACSIMILE – Based on an agreement by the parties to accept service by fax transmission, I faxed the documents from a fax machine in Irvine, California, with the number 949-252-0090, to the parties and/or attorney for the parties at the facsimile transmission number(s) shown herein. The facsimile transmission was reported as complete without error by a transmission report, issued by the facsimile transmission upon which the transmission was made, a copy of which is attached hereto.

[ ]   BY ELECTRONIC SERVICE – Based on a court order or agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the persons at the electronic notification addresses listed herein on the above referenced date.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[ X ]   BY MAIL - I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day, with postage thereon fully prepaid, at Irvine, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ]   BY CERTIFIED MAIL - I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day, with postage thereon fully prepaid, at Irvine, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[]   BY FEDERAL EXPRESS – I am readily familiar with the firm's practice of collection and processing correspondence for Federal Express.  Under that practice it would be deposited

1    with Federal Express on that same day in the ordinary course of business for overnight delivery with delivery costs thereon fully prepaid by sender, at Irvine, California.

2

3    [ ]    BY MESSENGER SERVICE – I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed herein and providing them to a

4    professional messenger service for service.  A declaration by the messenger service will be filed separately.

5

6    I declare under penalty of perjury under the laws of the State of California and the United States of America that the above is true and correct.

7    Executed on **February 14, 2011** at Irvine, California.

8

9                                                                 By: _Barbara Calvert_

10                                                                      Barbara Calvert

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE