2011-FEB-15  11:31    FROM-ABC LEGAL SERVICES                      +2132598413                T-017  P.002/002  F-031

FILED

1   Arnold P. Lutzker, DC Bar No. 101816, admitted PRO HAC VICE
    Jeannette M. Carmadella, DC Bar No. 500586, admitted PRO HAC VICE
2   Allison L. Rapp, MD Bar, PRO HAC VICE application for
    Lutzker & Lutzker LLP
3   1233 20th Street, NW, Suite 703
    Washington, DC 20036
4   Telephone No. 202-408-7600 Ext. 1
    Fax 202-408-7677
5   Email: arnie@lutzker.com
6
7   James M. Mulcahy (SBN 213547)
    jmulcahy@mulcahyllp.com
8   Kevin A. Adams (SBN 239171)
    kadams@mulcahyllp.com
9   Mulcahy LLP
    One Park Plaza, Suite 225
10  Irvine, California 92614
    Telephone No. (949) 252-9377
11  Fax 949-252-0090
12  ATTORNEYS FOR PLAINTIFFS

CLERK U S DISTRICT COURT
CENTRAL DIST. G  CALIF
LOS ANGELES

BY

13

14                  UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
15

16  ASSOCIATION FOR INFORMATION        Case No.: CV 10-09378 CBM (MANx)
    MEDIA AND EQUIPMENT, an Illinois
17  nonprofit membership organization; and
    AMBROSE VIDEO PUBLISHING, INC., a    **AMENDED COMPLAINT FOR:**
18  New York corporation,                (1) **Breach of Written Contract;**
19          Plaintiffs,                   (2) **Anticipatory Breach of**
                                              **Written Contract**
20          v.                            (3) **Copyright Infringement;**
    THE REGENTS OF THE UNIVERSITY OF     (4) **Declaratory Relief**
21  CALIFORNIA, a California corporation;  (5) **Violation of 17 U.S.C. § 1201;**
    MARK G. YUDOF, an individual; DR.    (6) **Breach of Covenants of Good**
22  GENE BLOCK, CHANCELLOR OF THE            **Faith and Fair Dealing;**
    UNIVERSITY OF CALIFORNIA, LOS        (7) **Unjust Enrichment;**
23  ANGELES, an individual; DR. SHARON   (8) **Tortious Interference with**
24  FARB, an individual; LARRY LOEHER, an    **Contractual Relations**
    individual; PATRICIA O'DONNELL, an   (9) **Tortious Interference with**
25  individual; and John Does 1-50,          **Prospective Business Advantage**
26          Defendants.                   DEMAND FOR JURY TRIAL
27

28
                              1
                      AMENDED COMPLAINT



Association for Information Media and Equipment ("AIME") and Ambrose Video Publishing, Inc ("AVP" or "Ambrose") (collectively, the "Plaintiffs") allege as follows:

## NATURE OF THE ACTION

1.     The Defendants in this case are The Regents of California, ("Regents") in their official capacity as an arm of the State of California governing the University of California at Los Angeles ("UCLA"), and in their individual capacities as members of the Board of Regents; Mark G. Yudof, President of the University of California, in his official and individual capacity ("Mr. Yudof"); Dr. Gene Block, Chancellor of UCLA, in his official and individual capacity (the "UCLA Chancellor"); Dr. Sharon Farb, UCLA's Associate University Librarian for Collection Management and Scholarly Communication, in her official and individual capacity ("Dr. Farb"), Larry Loeher, UCLA's Associate Vice Provost and Director of Instructional Development, in his official and individual capacity ("Mr. Loeher"), and Patricia O'Donnell, Manager of UCLA's Instructional Media Collections and Services and Media Lab, in her official and individual capacity ("Ms. O'Donnell"); and John Does 1-50, who are a) other individuals, presently unknown to Plaintiffs, who have been designated or in the future are designated to replace any of the other named Defendants in their official capacity, and b) any other individuals, who in their official and individual capacities, on a direct or contributory basis, participated in the actions complained of herein (collectively the "Defendants").

2
AMENDED COMPLAINT

2.     The Plaintiffs in this case are AVP, an educational video producer and holder of all exclusive rights associated with the specific copyrighted works in question in this case; and AIME, a national trade association whose public mission is to help ensure copyright education and compliance, and whose membership includes AVP and other video copyright owners and/or exclusive rightsholders.  A list of AIME members is attached hereto as Exhibit 1.

3.     This case involves the Defendants' systematic actions to take copy-protected DVDs, licensed by AVP and other AIME members, and copy, reformat, stream, publicly distribute, publicly display and/or publicly perform these DVDs via the Internet or the UCLA intranet, and to allow faculty and students to copy and perform and/or display these works in flagrant disregard of existing licenses, established copyright law and the Regents' and UCLA's own intellectual property policies.

4.     To accomplish this unlawful activity, upon information and belief, the Defendants utilize Video Furnace, a system manufactured and sold by Hai Vision Systems, Inc. ("HVS").  Video Furnace allows for the unauthorized recording of content and then its delivery as video on demand to computers and set top boxes. According to HVS 2009 publicity, UCLA helped HVS in the design of Video Furnace for use on college campuses and lent its name and reputation to the marketing efforts of HVS, thereby contributing to the trafficking of technology, device, service, device, components or parts thereof, which are capable of facilitating violations throughout

the United States of the copyright rights of AVP and other AIME members, who license programs to these institutions.

5.     As background to the dispute, on information and belief, sometime around January 2006, UCLA's Instructional Media Collections & Services ("IMCS"), which is directly managed and/or supervised by Defendants Dr. Farb, Mr. Loeher and Ms. O'Donnell, and supported by the other Defendants, acquired HVS's Video Furnace system.  With the Video Furnace system, the Defendants began copying programs owned by AVP and licensed to UCLA on a limited license basis, and streamed them on the University's web-based intranet.  In particular, IMCS illegally exploited AVP programs, "The Plays of William Shakespeare," in DVD format ("AVP Shakespeare DVDs").  "The Plays of William Shakespeare" were originally produced by the British Broadcasting Company ("BBC") and Time Life Films, Inc. ("Time").  As a result of the production agreement between BBC and Time, Time acquired exclusive rights to programs in the United States.  Subsequently, Time assigned all its rights in these programs to AVP.  In 2001, AVP created the AVP Shakespeare DVDs.  At all times relevant herein, AVP held and holds on an exclusive basis in the United States all relevant copyright rights pertaining to the AVP Shakespeare DVDs.

6.     On information and belief, utilizing the Video Furnace system, copies of the AVP Shakespeare DVDs were made directly by or under the direction of Defendants Mr. Loeher, Dr. Farb and Ms. O'Donnell, which copies were then converted to digital streams, linked to course web pages and remotely accessed by students and faculty.

4
AMENDED COMPLAINT

UCLA told AVP that over a five-year period at least 13 AVP Shakespeare DVDs were copied and streamed more than 130 times to an unspecified number of students and faculty.  Upon information and belief, once students and faculty are authorized to access the digital streams, the AVP Shakespeare DVDs can be viewed by system users via the UCLA network, inside or outside an educational setting, inside or outside the United States; that is, wherever the authorized user may be.

7.     AVP learned about the streaming practice in 2009.  Through AIME, AVP approached the UCLA Chancellor and objected to the practice.  AIME explained that UCLA's streaming practice violated established copyright law.  AVP also explained that streaming was a violation of the AVP Shakespeare DVD license.

8.     Prior to 2009, AVP had anticipated the need of educational institutions for streaming media.  At substantial effort and expense, AVP developed and currently offers educators Ambrose 2.0, high-quality, reasonably-priced institutional streaming licenses that would enable UCLA to make AVP programs available lawfully.  In fact, Ms. O'Donnell acknowledged to Allen Dohra, AVP Vice President-Sales and President of AIME Board of Directors, that she was aware of Ambrose 2.0 and that it offered a superior video product.  However, she declined to acquire the AVP streaming license, indicating that UCLA would continue to rely on the lesser quality streams it already had digitized.  Upon information and belief, the UCLA streams are not in compliance with federal disability laws, which require Closed Captions, nor in compliance with UC's Electronic Communications Policy regarding accessibility (*see*

Par. 19, *infra*).  Ambrose 2.0 is in full compliance with federal disability law requirements.  To the extent that AVP is identified as the source of the UCLA streams that are not in compliance with federal disability laws, AVP's reputation is harmed.

9.     Despite AIME's overtures to the UCLA Chancellor, UCLA was unrelenting. Initially, UCLA claimed absolute entitlement pursuant to two provisions of copyright law; 17 U.S.C. §110(1) (the public performance exemption for "face-to-face" teaching) and 17 U.S.C. §107 (fair use).  It later added reliance upon 17 U.S.C. §110(2) (the public performance exemption for certain digital distance learning uses).

10.     After AVP and AIME confronted the UCLA Chancellor with the prospect of a legal challenge to these theories, on information and belief, UCLA temporarily desisted.  After a winter-break period of reflection, the UCLA Chancellor's Office notified AVP that UCLA had the right to copy the AVP DVDs and to stream the content, so the practice would continue unabated.  Upon information and belief, the practice continues to this day and will continue in the future unless enjoined.

11.     If UCLA and other educational institutions are allowed to license DVDs from AVP and other educational video publishers who are members of AIME, and then copy and stream them to faculty and students without a license and without compensation to the creators, then existing and new markets for AVP's and other AIME member's pre-existing works will be unfairly preempted and the educational video business of AVP and other AIME members will suffer greatly.

12.   Thus, this legal dispute is rooted in a) UCLA's failure to comply with unambiguous provisions of the license pursuant to which the AVP Shakespeare DVD were licensed to UCLA, and b) UCLA's and the Regents' practices, as implemented by and through the Defendants and after notice that these actions were legally indefensible, of intentionally misinterpreting three provisions of copyright law, which provide only narrowly crafted educational use exceptions.  Any limitation in copyright law that is taken too far as the Defendants do, destroys the delicate balance between the policy that inspired its formulation and the intent of copyright law to compensate creators.  This case is about ensuring that the delicate balance is properly respected and not abused.

13.   This case is also about the fair adherence to contractual agreements between UCLA and AVP and other AIME members, who license use of their programs.

## PARTIES AND THEIR STANDING

14.   AVP is a New York corporation, whose principal business is the creation and distribution of high quality video content for the educational marketplace.   At all times pertinent to the infringements by the Defendants, AVP held and holds all exclusive rights to all the AVP Shakespeare DVDs in the United States, having acquired those rights from BBC and Time.  Works that the Defendants have copied and streamed in violation of AVP rights are registered with the U.S. Copyright Office in the name of AVP.  AVP licenses its video programs to many schools and colleges throughout the United States, including the State of California and UCLA.

7
AMENDED COMPLAINT

15.    AIME is an Illinois non-profit membership organization offering copyright information and support to teachers, librarians, media center directors, producers and distributors of informational film, video, interactive technologies, computer software and equipment.  AIME's mission is to promote fair and appropriate use of the media and equipment delivering information in a rapidly changing world.  AIME asserts standing to sue in this proceeding as an associational Plaintiff seeking prospective injunctive relief on behalf of its members.  AIME does not seek to remedy any copyright infringement claim that any member may have against UCLA; however, AIME asserts standing because: (1) its members who hold the necessary exclusive rights to their programs have standing to sue on their own for infringement of copyrights, and (2) the copyright interests that AIME seeks to protect are germane to AIME's purpose.  Moreover, neither the claims asserted by AIME, nor the narrow and tailored declaratory relief requested by AIME, requires the participation of individual members in the lawsuit.  AIME only seeks a declaratory ruling that prohibits the Defendants from prospectively infringing the copyrighted works of AIME members who hold all relevant exclusive rights to licensed DVDs, and to prevent copying and streaming of such DVDs without their consent.  To reiterate, AIME is seeking prospective declaratory or injunctive relief only, not monetary damages or other remedies.

16.    AIME also has a personal stake in the outcome of this litigation, suffering injury in fact.  It has suffered from the diversion of its resources to deal with the

8
AMENDED COMPLAINT

Defendants' infringements of AVP's copyrighted works, the potential infringement of other AIME members.  AIME members whose works have been digitized and streamed by Defendants include: AVP (37 titles), Bullfrog Films (10 titles), California Newsreel (32 titles), Direct Cinema (9 titles), Film Media Group (1 title), Icarus Films (1 title), Insight Media (2 titles), New Day Films (12 titles), PBS Video (56 titles) and Questar (2 titles).   *See* Exhibit 2.  AIME has been forced to spend much of its limited resources directly addressing the problem created by the Defendants for the educational video publishers, who are AIME's members and whose membership AIME seeks to maintain.  If AIME is unsuccessful in enjoining the way in which the Defendants' exploit educational videos of AIME members by prospective injunctive relief, then the mission of AIME will be materially, if not unalterably, frustrated. Directly as a result of Defendants' activities, AIME thus has been forced to divert its scarce resources away from the mission of information, to the action of prospective enforcement.

17.     The Regents is a corporation incorporated under the laws of the State of California, and its power derives from Article IX, Section 9 of the California Constitution. According to its Bylaws, namely Bylaw 5.1(a), the Regents has "full powers of organization and government" subject only to limited legislative control. The Regents is made up of a 26 member board and two nonvoting faculty members. The Regents administers the University of California educational system (sometimes herein "UC") as a public trust, of which UCLA is a member.  The present membership

9
AMENDED COMPLAINT

of The Regents includes the following individuals: 1) Appointed Regents: Richard C. Blum, Jesse Cheng, David Crane, William De La Pena, Russell Gould, Eddie Island, Odessa Johnson, George Kieffer, Sherry L. Lansing, Monica Lozano, Hadi Makarechian, George M. Marcus, Norman J. Pattiz, Bonnie Reiss, Frederick Ruiz, Leslie Tang Schilling, Bruce D. Varner, Paul Wachter and Charlene Zettlel; 2) Ex Officio Regents: Jerry Brown, Gavin Newsom, John A. Perez, Tom Torlakson, Mark G. Yudof, Rex Hime and Darek DeFreece; and 3) Faculty Representatives: Dan Simmons and Robert Anderson.

18.     Mark G. Yudof ("Mr. Yudof") is President of the Regents.  Pursuant to Regents' Standing Order 100.4(mm), the President of the Regents "is authorized to develop and implement policies and procedures on matters pertaining to intellectual property, including … copyrights … and to execute documents necessary for the administration of intellectual property, including those which may contain commitments existing longer than seven years. The President annually shall report to the Board on matters pertaining to intellectual property."

www.universityofcalifornia.edu/regents/bylaws/so1004.html.

19.     Over the past 25 years, the Regents have adopted and promulgated copyright policies for the entire University of California education system.  Principal promulgations of these policies, rules, and criteria are attached hereto as Exhibit 3. Among these policies, rules, orders and criteria, which remain in place today and are enforced by Mr. Yudof, are the following:

a) The mandate that the University of California "uphold[ing] copyright law," www.universityofcalifornia.edu/copyright/usingcopyrightworks.html;

b) The commitment of the entire UC Community to compliance with applicable intellectual property law, specifically including copyright law. ("The University of California is committed to upholding U.S. copyright law.") www.ucop.edu/irc/policy/copycommit.html);

c) The policy that deems it "vital that *the University of California faculty, students, and staff [to] understand and responsibly exercise rights accorded them under the copyright law*, particularly now in light of new technologies and laws that challenge long-standing educational and library exemptions and interpretations." www.universityofcalifornia.edu/copyright/ (emphasis supplied); and

d)  The University of California Electronic Communications Policy (ECP) that provides:

## II.  GENERAL PROVISIONS
### E. VIOLATIONS OF LAW AND POLICY

**1.  Law.** Federal and state law prohibit the theft or abuse of computers and other electronic resources such as electronic communications resources, systems, and services. Abuses include (but are not limited to) unauthorized entry, use, transfer, tampering with the communications of others, and interference with the work of others and with the operation of electronic communications resources, systems, and services. The law classifies certain types of offenses as felonies (see Appendix B, Reference).

**2. University Disciplinary Actions.** University policy prohibits the use of University property for illegal purposes and for purposes not in support of the mission of the University. In addition to legal sanctions, violators of this Policy may be subject to disciplinary action up to and including dismissal or

expulsion, pursuant to University policies and collective bargaining agreements. …

## III.  ALLOWABLE USE
### D.  Allowable Use
Use of University electronic communications resources is allowable subject to the following conditions: …

**9. Accessibility.**  All electronic communications intended to accomplish academic and administrative tasks of the University shall be accessible to allowable users with disabilities in compliance with law and University policies. …

**10.Intellectual Property.** *The contents of all electronic communications shall conform to laws and University policies regarding protection of intellectual property, including laws and policies regarding copyright, patents, and trademarks. When the content and distribution of an electronic communication would exceed fair use as defined by the federal Copyright Act of 1976, users of University electronic communications resources shall secure appropriate permission to distribute protected material in any form, including text, photographic images, audio, video, graphic illustrations, and computer software. …*

### E. ACCESS RESTRICTION
*… In compliance with the Digital Millennium Copyright Act*, the University reserves the right to suspend or terminate use of University electronic systems and services by any user who *repeatedly violates copyright law*. www.ucop.edu/ucohome/coordrev/policy/PP081805ECP.pdf.  Emphasis supplied.

20.    Since 1978, UC has applied for 1,762 copyright registrations with the United States Copyright Office.  See Exhibit 4.

21.    In addition to the UC system policy, rules and orders, UCLA has issued copyright policy statements and guidelines that commit UCLA to compliance with copyright law.  In particular, with respect to audiovisual materials, UCLA copyright policy states:

*Audiovisual materials copied in a different format*: Copying audiovisual material when change of format results is permitted when the conditions

12
AMENDED COMPLAINT

1    for replacement copying or preservation copying are met *or when*
2    *permission to change the format is granted by the publisher.*
     www.library.ucla.edu/copyright/2141.cfm (emphasis supplied).

3
4    Streaming requires a change in format and the compression of digital files. Therefore,

5    UCLA requires consent of owners of programming, including AVP, which consent

6    UCLA failed to seek or secure. UCLA has also issued the following warnings

7
8    concerning copyright restrictions:

9        1) The copyright law of the United States (Title 17, United States Code)
            governs the making of photocopies of other reproductions of
10           copyrighted materials….This institution reserves the right to refuse to
             accept a copying order if, in its judgment, fulfillment of the order
11           would involve violation of Copyright Law.
             www.library.ucla.edu/copyright/2135.cfm.
12

13       2) If electronic transmission of reserve material is used for purposes in
14          excess of what constitutes "fair use," that user may be liable for
            copyright infringement. www.library.ucla.edu/copyright/2131.cfm.
15

16   Exhibit 5.

17   22.    Collectively, the UC and UCLA orders, policies, and actions go well beyond
18
19   merely discouraging copyright infringement; rather, they constitute an affirmative

20   public commitment to "upholding the [copyright] law." As a result, these orders,

21   policies and actions have brought the UC system, including all the Defendants, within
22
23   the federal copyright system. They thus constitute an express waiver of any claim to

24   sovereign immunity with respect to Plaintiffs' claims herein.

25   23.  Moreover, the Defendants, including the UCLA Chancellor, Dr. Farb, Mr. Loeher
26
27   and Ms. O'Donnell, have, by virtue of UCLA's agreement to the Terms and

28   Conditions set forth in the 2006-2007 AVP License for the AVP Shakespeare DVDs

13
AMENDED COMPLAINT

(the "2006-2007 AVP License") (Exhibit 6) and the Terms and conditions set forth in the 2008-2011 AVP License for other DVDs licensed by UCLA (the "2008-2011 AVP License") (Exhibit 7) (collectively, the 2006-2007 AVP License and the 2008-2011 AVP License, the "AVP Licenses") have expressly waived any claim to sovereign immunity or qualified immunity.  Both the AVP Licenses both expressly provide: "Nothing herein shall derogate from any rights of Ambrose … under the United States Copyright Law."  (Section 1, 2006-2007 AVP License Exhibit 6, and Section 1, 2008-2011 AVP License Exhibit 7).

24.    Pursuant to Standing Order 100.6 of the Regents, the UCLA Chancellor is "the chief campus officer thereof and shall be the executive head of all activities on that campus ….  The Chancellor shall be responsible for the organization and operation of the campus, its internal administration, and its discipline; and decisions made by the Chancellor in accordance with the provisions of the budget and with policies established by the Board or the President of the University shall be final." Exhibit 3. As the chief campus officer, the UCLA Chancellor received correspondence from AVP and AIME, and upon information and belief, instructed his legal counsel, who works within the Office of the Chancellor, and other UCLA staff to respond thereto.

25.    Dr. Farb is the individual responsible for overseeing the activities of the UCLA library system in connection with digital collections management and licensing and copyright management issues.

26.     Mr. Loeher, in his role as Director of the Office of Instructional Development, is responsible for directly supervising Ms. O'Donnell and ensuring that her conduct is consistent with UCLA's objectives and legal policy.

27.     Ms. O'Donnell presides over the IMCS, which is UCLA's primary resource for acquiring educational films, videos and DVDs and for advising faculty members respecting the classroom use of such media.

28.     John Does 1-50 are persons presently unknown to Plaintiffs, who either contributed to the infringements of the AVP Shakespeare DVDs, or who have replaced or will replace the particular individuals identified herein and who thus need to come within the terms of any prospective injunction.

29.     The Regents personally named in Paragraph 15 hereinabove, the UCLA Chancellor, Mr. Yudof, Dr. Farb, Mr. Loeher and Ms. O'Donnell are sued in their individual capacities for directly infringing or contributing to the infringements of AVP's copyrights and violations of AVP's licenses.

## JURISDICTION AND VENUE

30.     This is a civil action for breach of contract, breach of covenants, anticipatory breach of contract, unjust enrichment and tortious interference with business relationships under common law,  and violation of the Copyright Act of 1976, as amended, 17 U.S.C. §101, *et. seq.* and for declaratory relief.

31.     The Court has personal jurisdiction over the Regents as a corporation incorporated under the laws of California, and over the individual Regents identified

1    in Paragraph 15 hereinabove, the UCLA Chancellor, Dr. Farb, Mr. Loeher and Ms.

2    O'Donnell, as individuals residing in the State of California.

3    32.    This Court has subject matter jurisdiction to hear Plaintiff's copyright

4    
5    infringement claim under 17 U.S.C. §101 et seq., 28 U.S.C. §§ 1331 and 1338,

6    supplemental jurisdiction to hear all other claims under 28 U.S.C. §1367, and

7    
8    jurisdiction over declaratory relief requested under 28 U.S.C. §§2201(a) and 2202.

9    Venue is proper under 28 U.S.C. §1391(b) and 28 U.S.C. §1400(a).

10                                    FACTS

11   I. DEFENDANTS INFRINGED AMBROSE'S COPYRIGHTS FOR THE AVP

12   SHAKESPEARE DVDS AND BREACHED THE AVP LICENSES

13   
14       A.  The AVP Educational DVD Offerings

15   33.    For more than twenty years, AVP has produced and distributed high quality

16   programs in science, history and drama.  Not only has AVP produced award winning

17   
18   programs, but also it has acquired works from third parties, such as the BBC,

19   Discovery Channel and independent producers pursuant to license agreements

20   providing for royalty payments and containing other terms and conditions.  AVP

21   
22   programs are licensed to educational institutions in all digital formats.  DVDs have

23   been available since the year 2000 and Mpeg files in other formats have been

24   available since 2002.  Individual professors and students, as well as institutions,

25   
26   purchase the DVDs.

27   
28   
                                        16

34.     Many AVP titles feature supplemental educational content, such as concept clips, closed captioning, Spanish subtitles, research guides, maps, timelines, and historical documents using computer graphics, all to enrich the learning experience for students and teachers.   Exhibit 8 is the Ambrose Educational DVD Catalog 2009-2010.

35.     In addition to licensing programs for classrooms and libraries, a number of years ago, AVP made a substantial investment to create Ambrose Video 2.0, a download program and video streaming website (located at www.ambrosedigital.com) that allows educational clients to access more easily the AVP catalog in a number of digital formats.  Given the ever-growing needs of educational institutions to provide varied and flexible content delivery systems for its faculty and student body, Ambrose Video 2.0 has become one of AVP's primary delivery options for educational offerings.   To initiate Ambrose Video 2.0, older video programs, along with newer ones, had to be encoded, captioned and stored.  Then, the technological system to enable efficient real-time delivery had to be developed and implemented.  Ambrose Video 2.0 puts AVP at the forefront of educational video publishers who strive to serve the growing needs and interests of the educational community.  Exhibit 9 consists of pages from the Ambrose Educational DVD Catalog providing further detail on Ambrose Video 2.0.

36.     To meet its obligations to program producers and its own financial needs, AVP has established terms and conditions that control the use of DVD programs.   It

17
AMENDED COMPLAINT

licenses schools and universities, including UCLA, the right to use copyrighted programs available in DVD format as set forth in the AVP Licenses.  In connection with DVDs that AVP has licensed to UCLA since 2006, there are two relevant AVP licenses.

37.    The terms of the license applicable to Defendants' use of the AVP Shakespeare DVDs are 2006-2007 AVP License.  In addition to all "The Plays of William Shakespeare," acquired by UCLA in 2006, UCLA also acquired the "Childhood Set" DVD series in 2007.  The 2006-2007 AVP License, set forth in Exhibit 6, provides in pertinent part:

> **1. License:** Ambrose grants Customer and Customer accepts from Ambrose the limited license under copyright to exhibit one or more of the films, video and/or sound filmstrip programs or both ordered or rented by Customer (hereinafter called "Programs"), but only for exhibition to non-paying private audiences during the period set forth and in accordance with the specific terms of said order or rental….
>
> CUSTOMER ACKNOWLEDGES THAT THE PROGRAMS MAY NOT BE DUPLICATED, BROADCAST, TRANSMITTED BY CABLE OR OTHERWISE, ON ANY MULTI-RECEIVER OPEN OR INTERNET SYSTEM, OR DISPLAYED BEFORE THE PUBLIC, WHETHER OR NOT ADMISSION IS CHARGED…
>
> Customer shall not … part with possession of any Program received by Customer hereunder. … Nothing herein shall derogate from any rights of Ambrose or any other copyright proprietor of any Program under the United States Copyright Law….

38.    In addition to the AVP Shakespeare DVDs and the Childhood Set DVDs, UCLA also licensed another AVP DVD series entitled "Long Search" in 2009.  The terms of the license applicable to these DVDs are set forth in the 2008-2011 AVP

18
AMENDED COMPLAINT

License, set forth on the AVP's website at http://www.ambrosevideo.com/order.cfm.

Exhibit 7.

39.   The 2008-2011 AVP License provides in pertinent part:

**1. Grant of License:** AVP grants to the Licensee a limited, non-exclusive, revocable license to use the Content (as defined below) in an educational OR home video setting.

**CUSTOMER ACKNOWLEDGES THAT THE PROGRAMS MAY NOT BE DUPLICATED, BROADCAST, TRANSMITTED BY CABLE OR OTHERWISE, ON ANY MULTI-RECEIVER OPEN OR INTERNET SYSTEM, OR DISPLAYED BEFORE THE PUBLIC, WHETHER OR NOT ADMISSION IS CHARGED. CUSTOMER SHALL EXHIBIT THE PROGRAMS ONLY AS HEREIN SPECIFIED AND USE THE PROGRAMS FOR NO OTHER PURPOSE.**

Customer shall not sublicense, sublease or part with possession of any Program received by Customer hereunder. Performing rights to music contained in any Program are not granted herein. Nothing herein shall derogate from any rights of Ambrose or any other copyright proprietor of any Program under the United States Copyright Law or any applicable foreign copyright laws. The Content is licensed solely for classroom teaching, research, educational non-commercial multimedia projects, classroom presentations, and individual presentations for use in educational institutions or public libraries.

40.   Both AVP Licenses provide that in the event of default AVP has the right to terminate the license "in addition to and without prejudice to any right or remedy in law or equity or provided for elsewhere in this agreement on account of any violation or breach."

   B.   *Streaming of AVP Shakespeare DVDs*

41.   While UCLA's use of AVP Shakespeare DVDs is subject to the 2006-2007 AVP License, AVP also offers educational institutions the ability to acquire streaming rights to programs via Ambrose Video 2.0.

42.   "Streaming" is the process whereby content is a) copied to conform to the format of a transmitting unit, b) publicly distributed in compressed form over the Internet, c) copied onto the user's computer and d) then publicly displayed by a viewer in real time.  When received by the user, the user does not have wait to download an entire program to begin viewing; rather, the compressed data is decompressed and transmitted from a temporary file to a video display as a continuous "stream" of video files.

43.   To produce the stream, the source (e.g. IMCS) needs a device that copies, conforms the work to a usable digital format and transmits it.  To see the streamed content, the viewer needs a player, which is a special program that receives (copies) the files, decompresses the content, and sends video data to the display screen and audio data to the speakers.

44.   The process of digitally streaming video programs implicates a number of exclusive copyright rights of educational video publishers and exclusive distributors like AVP, including the right to reproduce or copy a work, the right to publicly perform a work, the right to publicly distribute a work and the right to publicly display a work. 17 U.S.C. §106.

45.   When the streamed work is accessed by the viewer, it is displayed on a screen and the contents are performed.  If the screen is in a public place, like a classroom or auditorium, the display and/or performance is "public."  Similarly, if many persons can view the content in different remote locations, like a number of dorm rooms or

1   apartments, the copyright law deems such multiple performances "public." 17 U.S.C.

2   §101.

3   46.     Upon information and belief, a viewer of the AVP Shakespeare DVDs streamed

4

5   by UCLA does not have to be in an educational setting.  For example, the student with

6   access to the UCLA network can be in a WiFi hot spot anywhere, such as at Starbucks

7

8   coffee shops off campus.  Upon information and belief, the viewer does not even have

9   to be in the United States.  As long as there is authorized access to the UCLA via the

10  Internet, the program may be performed.  If the streamed content is subject to the

11
    2008-2011 AVP License, then that use would be in violation of the 2008-2011 AVP
12

13  License, which restricts UCLA's use to educational or home video settings.

14  47.     As noted, Ambrose Video 2.0 is an affordable video streaming offering for

15
    individuals and all kinds of educational institutions, from home schoolers to research
16

17  institutions of higher education.  Ambrose Video 2.0 has been designed to ensure not

18  only that its programs are made available for use with the newest technological

19
    innovations, but also that these uses are consistent with the rights and obligations that
20

21  AVP owes third parties, like the BBC, music authors, screenwriters, photographers

22  and others whose works are distributed or incorporated into AVP programs.  Ambrose

23
    Video 2.0 thus incorporates Digital Rights Management ("DRM"), or technological
24

25  measures designed to control access to and copying of the DVDs.

26  48.     The pricing of AVP streaming rights to video programs is tailored to every

27
    institutional need.  For example, a license for an unlimited simultaneous stream of the
28

AVP Shakespeare DVD "Measure for Measure," with closed captioning to all students and faculty served by the UCLA Los Angeles campus for one year can be acquired for $24.99. AVP bundles up to 50 hours of programming for $889.00. *See* Exhibit 9. Lower priced options are available for home schools and individual teachers.

C.   *UCLA's Breach of Contract and Copyright Infringements*

49.   Pursuant to the 2006-2007 AVP License, UCLA licensed (a) AVP Shakespeare DVDs consisting of 37 DVDs, the entire series, "The Plays of William Shakespeare" in 2006; and (b) "Childhood Set" in 2007. The AVP Shakespeare DVDs are among AVP's most popular offerings. Pursuant to the 2008-2011 AVP License, UCLA acquired AVP's DVD series "Long Search." AVP holds all pertinent exclusive copyright rights to all these works in the United States.

50.   Given the license restrictions on streaming AVP videos and the reasonableness of the Ambrose Video 2.0 streaming license, it came as a rude shock when AVP learned that IMCS had been streaming AVP programs for years without prior request, approval, or any effort on their part to ascertain whether such a license was deemed necessary or available.

51.   At the time of this infringement discovery and aware that UCLA's actions could affect many other, similarly-situated educational video publishers, AVP enlisted the support of AIME. On May 19, 2009, Betty G. Ehlinger, Executive Director of AIME, wrote Ross Bollens, Director of Information Technology Security of UCLA's

Office of Information Technology, regarding the revelation by Ms. O'Donnell that she had been utilizing Video Furnace to copy, digitize and stream AVP Shakespeare DVDs for many years. Exhibit 10. Writing on behalf of AVP, Ms. Ehlinger advised Mr. Bollens that this practice violated copyright law and sought an accounting of the activities and assurance of future compliance with licenses and the law.

52.    Mr. Bollens did not respond, so on June 18, 2009, Ms. Ehlinger wrote to the UCLA Chancellor. Exhibit 11. On July 24, 2009, L. Amy Blum, Senior Campus Counsel in the Office of the Chancellor, responded to both of Ms. Ehlinger's letters. Exhibit 12. In her response, Ms. Blum set forth legal defenses for UCLA's digitizing and streaming practices, citing Sections 107 and 110(1) of the Copyright Act. 17 U.S.C. §§107 and 110(1).

53.    On September 16, 2009, Arnold P. Lutzker, Counsel for AIME, replied to Ms. Blum's analysis, in which he contested both prongs of UCLA's defense, indicating that neither Section 107 nor Section 110(1) authorized or allowed the UCLA practices. Exhibit 13. Mr. Lutzker urged that the parties should meet to see if a resolution of the dispute was feasible, but that before such meeting, UCLA should provide more details regarding digitizing and streaming of AIME member programs.

54.    On October 21, 2009, UCLA responded, indicating that it would meet with AIME and that IMCS would temporarily stop streaming content outside the Library commencing December 20, 2009. Exhibit 14. In her response, Ms. Blum sought to

narrow UCLA's liability, but that suggestion was rejected by letter dated October 28, 2009. Exhibit 15.

55.     A meeting of the parties was held on January 19, 2010.  Mr. Dohra represented AVP and AIME, and Dr. Farb, Ms. O'Donnell and Mr. Loeher represented UCLA. The meeting did not resolve the dispute.

56.     On information and belief, by public pronouncement and by letter dated March 2, 2010, UCLA publicly announced and advised AVP that it would resume copying and streaming DVDs from its libraries, adding Section 110(2), 17 U.S.C. §110(2), as an additional justification for its practice, and indicating that it would require professors to articulate a pedagogical purpose for any streaming request.  Exhibit 16.

D.     *UCLA's Actions Violate the Copyright Law Including the DMCA*

57.     On information and belief, UCLA uses HVS's Video Furnace to copy, distribute, perform and display AVP Shakespeare DVDs, all in violation of AVP's exclusive copyright rights and in breach of the covenants in the 2006-2007 AVP License.

58.     On information and belief, the making of copies of AVP Shakespeare DVDs utilizing Video Furnace also entails the bypassing of copy-guarded codes embedded within each AVP Shakespeare DVD.  Copy-guarded codes are an integral part of AVP's Digital Rights Management ("DRM") system, or technological measures that AVP employs to prevent unauthorized access, copying and use of AVP Shakespeare DVDs.  Such codes are a key mechanism not only for implementing the license

24<br>AMENDED COMPLAINT

1    restrictions in the 2006-2007 AVP License, as well as the 2008-2011 AVP License,

2    but also for assuring compliance with AVP's obligations to third parties, whose

3    programs it distributes or works it incorporates within AVP DVDs.

4

5    59.    On information and belief, the circumvention of AVP's DRM constitutes

6    violations of Sections 1201(a) and (b) of the Copyright Act.  17 U.S.C. §1201(a) and

7    (b).  On information and belief, the Defendants are liable in their individual and

8

9    official capacities for UCLA's actions to circumvent AVP's technological measures

10   that effectively control access to and copying of its programs.

11   60.    On information and belief, UCLA worked in close coordination with HVS and

12

13   a few other universities, to develop Video Furnace applications for use by higher

14   education.  According to statements that have appeared on HVS's website:

15

16           HaiVision's Video Furnace is the premier package for end-to-end
             delivery of content for higher education and K-12 institutions. Video
17           Furnace is ideal for delivering cable content in dormitories and across the
             campus, for providing video-on-demand content for use within classes
18           and by students at their leisure, for launching campus TV stations, for
             making special classes or events available to everyone, and for recording
19           classes and events for later review. … *Video Furnace was initially
             developed in close collaboration with a number of leading universities*
20           *including Northwestern, Dartmouth, and UCLA.*
             http://www.haivision.com/applications/education (accessed September
21           13, 2009.)  Emphasis supplied.
22

23   61.    On information and belief, based on its direct assistance to HVS and their

24   willingness to lend their name and reputation to the marketing efforts of HVS,

25

26   Defendants have trafficked in Video Furnace, which is a technology, product, service,

27   device, component, or part thereof, that (A) is primarily designed or produced for the

28

AMENDED COMPLAINT