KEKER & VAN NEST LLP
ROBERT A. VAN NEST - #84065
rvannest@kvn.com
R. JAMES SLAUGHTER - #192813
rslaughter@kvn.com
MICHAEL S. KWUN - #198945
mkwun@kvn.com
ANDREW F. DAWSON - #264421
adawson@kvn.com
710 Sansome Street
San Francisco, CA  94111-1704
T: 415-391-5400/F: 415-397-7188

JONATHAN BAND - #122369
jband@policybandwidth.com
21 Dupont Circle NW, 8th Floor
Washington, DC 20036
T: 202-296-5675/F: 202-872-0884

CHARLES F. ROBINSON - #113197
charles.robinson@ucop.edu
KAREN J. PETRULAKIS - #168732
karen.petrulakis@ucop.edu
ERIC K. BEHRENS - #79440
eric.behrens@ucop.edu
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, CA 94607-5200
T: 510-987-9800/F: 510-987-9757

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ASSOCIATION FOR INFORMATION MEDIA AND EQUIPMENT, an Illinois nonprofit membership organization; and AMBROSE VIDEO PUBLISHING, INC., a New York corporation,<br><br>            Plaintiffs,<br><br>     v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a California corporation; MARK G. YUDOF, an individual; DR. GENE BLOCK, CHANCELLOR OF THE UNIVERSITY OF CALIFORNIA, LOS ANGELES, an individual; DR. SHARON FARB, an individual; LARRY LOEHER, an individual; PATRICIA O'DONNELL, an individual; and John Does 1-50,<br><br>            Defendants. | Case No. 10-cv-09378 CBM (MANx)<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM**<br><br>Date:       May 2, 2011<br>Time:      11:00 a.m.<br>Dept:      Courtroom 2<br>Judge:     Hon. Consuelo B. Marshall<br><br>Date Comp. Filed: Dec. 7, 2010 |

# TABLE OF CONTENTS

I.    INTRODUCTION........................................................................................1

II.   ARGUMENT ..............................................................................................2

    A.    Defendants Are Immune from Suit............................................................2

        1.    The Regents and the individual defendants sued in their official capacities are immune from claims for damages in federal court. .......................................................2

        2.    Claims for injunctive relief as to President Yudof and Chancellor Block must be dismissed because the Complaint fails to allege any facts as to their personal involvement in the events alleged..............................4

        3.    The officials sued in their individual capacities are immune from liability. ............................................6

            a.    The individual defendants are entitled to qualified immunity for the alleged violations of federal law.............................................6

            b.    The individual defendants are immune from personal liability for violations of state law pursuant to California Government Code § 820.2. ..........................................................9

    B.    AIME Has No Standing to Sue Under the Declaratory Judgment Act. ......................................................................10

        1.    AIME cannot establish associational standing. ........................10

        2.    AIME has no individual standing because it has not suffered a cognizeable injury in fact. ..........................12

    C.    Ambrose Fails to Allege a Plausible Claim for Copyright Infringement. ......................................................................13

    D.    Ambrose Similarly Fails to Allege a Factual Basis for its DMCA Claim. ......................................................................15

    E.    Ambrose's Claims Under California State Law are Either Preempted by the Copyright Act or are Insufficiently Pled...........................................................................17

        1.    Ambrose concedes that its primary contract claim is preempted, and any other claim is insufficiently pled.............................................................................17

        2.    Ambrose's claim for anticipatory breach of contract is preempted and, in any event, is not cognizeable under California law. .............................18

i

552600.01

   3. Ambrose's remaining state-law claims are preempted for the same reasons.................................................. 19

III.  CONCLUSION ........................................................................ 21

552600.01

# TABLES OF AUTHORITIES

## Federal Cases

*Altera Corp. v. Clear Logic, Inc.*
424 F.3d 1079 (9th Cir. 2005)...................................................17

*Ashcroft v. Iqbal*,
129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ...........................8, 17

*Celestial Mechanix, Inc. v. Susquehanna Radio Corp*
No. 03-5834, 2005 WL 4715213, (C.D. Cal. Apr. 28 2005)..............20

*Chesler/Perlmutter Products Inc. v. Fireworks Entertainment, Inc.*
177 F. Supp. 2d 1050 (C.D. Cal. 2001)...............................19

*College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*
527 U.S. 666, 119 S. Ct. 2219, 114 L. Ed. 2d 605 (1999)....................3

*Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*
606 F.3d 612 (9th Cir. 2010)..................................................11

*Employees of Dep't of Pub. Health & Welfare v. Mo. Pub. Health Dep't*
411 U.S. 279, 93 S. Ct. 1614, 36 L. Ed 2d 251 (1973)...........................2

*Falcon Enters., Inc. v. Nobel Developments, Inc.*
CV06-1404, 2007 WL 737347 (W.D. Wash. Mar. 5, 2007)..............20

*Fla. Prepaid Postsecondary v. College Sav.*
527 U.S. 627, 119 S. Ct. 2199, 144 L. Ed. 2d 575 (1999)....................4

*Green v. Mansour*
474 U.S. 64, 106 S. Ct. 423, 88 L. Ed. 2d 371 (1985)......................2

*Harlow v. Fitzgerald*
457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).....................6

*Havens Realty Corp. v. Coleman*.
455 U.S. 363, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982)...............12, 13

*Hunt v. Washington State Apple Advertising Commission*
432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)................10

*Hunter v. Bryant*
502 U.S. 224, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991)....................7

*MDY Industries, LLC v. Blizzard Entertainment, Inc.*
629 F.3d 928 (9th Cir. 2010)...........................................16, 20

*Nat'l Ass'n of Bds of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*
633 F.3d 1297 (11th Cir. 2011)..................................................4

*Oldcastle Precast, Inc. v. Granite Precasting & Concrete, Inc.*
No. C10-322, 2010 WL 2217910 (W.D. Wash. June 1, 2010)..............20

*Pearson v. Callahan*
129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) .............................7

*Pennington Seed, Inc. v. Produce Exchange No. 299*
457 F.3d 1334 (Fed. Cir. 2006)...........................................5, 6

iii

*Perfect 10. Inc. v. Amazon.com. Inc.*
    508 F.3d 1146 (9th Cir. 2007)........................................................................ 14

*Saucier v. Katz*
    533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)................................... 6

*Sony Corp. of America v. University City Studios. Inc*
    464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984)..................................... 15

*Spann v. Colonial Village. Inc.*
    899 F.2d 24 (D.C. Cir. 1990) .................................................................. 12, 13

*Sybersound Records. Inc. v. UAC Corp.*
    517 F.3d 1137 (9th Cir. 2008)...................................................................... 12

*United States v. Georgia*
    546 U.S. 151, 126 S. Ct. 877, 163 L. Ed. 2d 650 (2006)...................................... 3

*Zito v. Steeplechase Films. Inc.*
    267 F. Supp. 2d 1022 (N.D. Cal. 2003) ........................................................ 19


**State Cases**

*Caldwell v. Montoya*
    10 Cal. 4th 972, 42 Cal. Rptr. 2d 842 (1995)................................................ 10

*Diamond v. Univ. of So. California*
    11 Cal. App. 3d 49, 89 Cal. Rptr. 302 (1970) ............................................... 18

*Minor v. Minor*
    184 Cal. App. 2d 118, 7 Cal. Rptr. 455 (1960) .............................................. 18

*Morgan v. Yuba Cnty.*
    230 Cal. App. 2d 938, 41 Cal. Rptr. 508 (1964).............................................. 10


**Federal Statutes**

17 U.S.C. § 107.............................................................................................. 9

17 U.S.C. § 501(b)........................................................................................ 11


**State Statutes**

California Government Code § 820.2 ................................................................ 9


**Constitutional Provisions**

Eighth Amendment to the U.S. Constitution....................................................... 3

Eleventh Amendment to the U.S. Constitution ........................................ 2, 3, 4, 21

Article 9 of the California Constitution.............................................................. 4


**Other Authorities**

U.S. Copyright Office
    DMCA Section 104 Report (2001) ...................................................... 8, 9, 14

# I.   INTRODUCTION

Plaintiffs' Opposition is more remarkable for what it concedes than what it disputes.  First, Ambrose does not dispute that UCLA has the right to publicly perform the DVDs in question.  *See* Opp. at 10.  Ambrose has therefore conceded that it falsely accused UCLA of infringing a right that, according to the exhibits to Plaintiffs' own Complaint,[1] UCLA was authorized to exercise.  Second, Plaintiffs do not dispute that the individual members of the Board of Regents, despite being purportedly named in the body of the complaint, are not proper parties to this suit.  Third, Plaintiffs concede that Congress's passage of the Copyright Remedy Clarification Act ("CRCA") did not abrogate the states' immunity from all claims for copyright infringement.  *See* Opp. at 4.  Finally, Ambrose has conceded that the gravamen of its claim for breach of contract—namely, that UCLA breached the duplication and transmission provisions of the alleged license agreement—is preempted under the law in the Ninth Circuit.  *See* Opp. at 5 n.9.

Plaintiffs' principal argument is not an argument at all, but rather a complaint.  Plaintiffs complain that, if this Court accepts Defendants' arguments and dismisses the Complaint, they will be wrongly deprived of a judicial forum and will be left "with no remedies whatsoever."  Opp. at 1.  But as explained in Defendants' motion, Plaintiffs fail to state any plausible claim for relief.  Defendants do not dispute that this court would have jurisdiction over a properly pleaded claim under *Ex parte Young*, but Plaintiffs have failed to allege one.  The question is therefore not one of access to a remedy, but of whether Plaintiffs have stated a claim.  Because they have failed to do so, they are not entitled to a remedy and their case should be dismissed.

---

[1]   *See* Am. Compl., ex. 8 ("All purchases by schools and libraries include public performance rights.").

## II.   ARGUMENT

**A.   Defendants Are Immune from Suit.**

### 1.   The Regents and the individual defendants sued in their official capacities are immune from claims for damages in federal court.

As explained in Defendants' opening brief, "an unconsenting State is immune from suits brought in federal courts." *Employees of Dep't of Pub. Health & Welfare v. Mo. Pub. Health Dep't*, 411 U.S. 279, 280, 93 S. Ct. 1614, 36 L. Ed 2d 251 (1973). This immunity extends to claims for damages against state officials sued in their official capacities and persists unless the state consents to be sued or Congress validly overrides the state's immunity. *See Green v. Mansour*, 474 U.S. 64, 68, 106 S. Ct. 423, 88 L. Ed. 2d 371 (1985). Plaintiffs concede that Congress's passage of the CRCA on its own did not abrogate Defendants' immunity from claims for copyright infringement. *See* Opposition at 4.

Plaintiffs make two arguments in an attempt to evade the force of this immunity, neither of which is persuasive. First, Plaintiffs argue that the 2008-2011 License Agreement contains language expressly waiving Eleventh Amendment immunity. Plaintiffs point to a forum selection language which states that "Licensee hereby consents to the jurisdiction of the state and federal courts located in New York, New York." Am. Compl., Ex. 7, ¶ 14. There are numerous problems with this argument. To begin with, the DVDs at issue in this case for which Ambrose alleges breach of contract were sold in 2006—years before the 2008-2011 Agreement could have come into effect. *See* Am. Compl. ¶ 83. The agreement allegedly in effect at *that* time does not contain a forum selection clause at all. *Id.* As a result, the provision on which Plaintiffs rely to argue waiver is not applicable to the DVDs at issue in this case.[2] Moreover, application of the alleged

---

[2]   The alleged 2008-2011 Agreement is potentially relevant only to Ambrose's claim for anticipatory breach of contract, so the purported waiver applies only to that claim. But as explained below in Part II.E.2, Ambrose has failed to state a claim for anticipatory breach of contract.

1   provision to non-contractual claims (such as the copyright infringement and

2   DMCA claims) would amount to an implicit waiver of Eleventh Amendment

3   immunity.  Such an implicit waiver is invalid.  *See College Sav. Bank v. Fla.*

4   *Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 682, 119 S. Ct. 2219,

5   114 L. Ed. 2d 605 (1999).  Finally, there is a fatal flaw in Plaintiffs' arguments as

6   to AIME: the alleged forum selection clause is found in an Ambrose form

7   contract—a contract to which neither AIME nor any of its other members has ever

8   been a party.  Thus, the clause cannot constitute consent to a suit by AIME.

9        Plaintiffs' second argument in opposition to Defendants' immunity is

10  similarly unpersuasive.  Plaintiffs contend that because Defendants' "infringements

11  amount to an actual violation of the due process clause," they are entitled to pursue

12  a remedy of that violation via copyright law.  For support, Plaintiffs rely on *United*

13  *States v. Georgia*, in which the Supreme Court permitted a suit against a state

14  entity under the Americans with Disabilities Act ("ADA") because the conduct

15  alleged by a disabled prisoner not only violated the ADA, but also amounted to

16  cruel and unusual punishment in violation of his Eighth Amendment rights.  546

17  U.S. 151, 158, 126 S. Ct. 877, 163 L. Ed. 2d 650 (2006).  Plaintiffs analogize

18  *Georgia* to this case, arguing that because there was no post-deprivation process by

19  which Plaintiffs could contest the infringement of their copyrights, the deprivation

20  itself constituted a violation of their rights.

21       No court has ever accepted the application of *Georgia* to a due process claim

22  in this manner.  For good reason.  In *Georgia*, the conduct alleged simultaneously

23  violated the ADA and the Eighth Amendment.  Therefore, by prevailing under the

24  ADA, the plaintiff automatically vindicated his constitutional rights.  That is not so

25  here.  Whether or not a copyrighted work has been infringed says nothing about

26  whether due process was afforded.  Indeed, a due process claim *presumes*

27  infringement has already occurred, and then asks the further question whether that

28  deprivation was accompanied by due process.  By proving infringement, then, one

1   has simply proved a condition precedent of a due process claim.  No court has

2   extended *Georgia* to a case where the statutory and constitutional rights require

3   proof of such entirely different elements.  *See Nat'l Ass'n of Bds of Pharmacy v.*

4   *Bd. of Regents of the Univ. Sys. of Ga.,* 633 F.3d 1297, at *14 n.32 (11th Cir. 2011)

5   ("This alleged conduct—failing to provide a hearing—is not identical to copyright

6   infringement. Therefore, NABP's argument that it was owed a pre-deprivation

7   hearing is not implicated by a strict understanding of what it is to infringe a

8   copyright and thus arguably not covered by *Georgia*.").

9        It is further apparent that Plaintiffs have access to post-deprivation

10  procedures.  It is not the case—as Plaintiffs contend—that Plaintiffs have been left

11  without access to a remedy.  If Plaintiffs could state a claim for relief, they could

12  avail themselves of *Ex parte Young* and obtain an injunction barring the alleged

13  infringement.  But Plaintiffs mistakenly demand a remedy before establishing that

14  they have a right.  Moreover, California provides extensive process by which a

15  plaintiff can obtain a remedy in state court.  The California Constitution itself

16  provides that the Regents are subject to suit in state court, Cal. Const. art. 9, § 9(f),

17  and the Supreme Court has suggested that such judicial remedies provide sufficient

18  process.  *See Fla. Prepaid Postsecondary v. College Sav.*, 527 U.S. 627, 644, 119

19  S. Ct. 2199, 144 L. Ed. 2d 575 (1999).  The fact that some such claims are

20  preempted by federal law does not change the fact that the state has provided post-

21  deprivation procedures.  It was Congress's decision to withdraw these remedies,

22  not California's.  And regardless, Plaintiffs retain the ability to vindicate their

23  rights via non-preempted state-law claims and *Ex parte Young*.

24       **2.      Claims for injunctive relief as to President Yudof and Chancellor**
25       **Block must be dismissed because the Complaint fails to allege any**
         **facts as to their personal involvement in the events alleged.**

26       It is undisputed that *Ex parte Young* and its progeny provide an exception to

27  the states' immunity under the Eleventh Amendment.  But before such a suit can

28  be allowed to proceed past the pleading stage, two conditions must be satisfied.

4

1    First, the suit must name a proper individual defendant.  Second, the suit must state

2    a substantive claim for relief.  Defendants do not dispute that, if Plaintiffs had

3    stated such a claim—which they have not—Defendants Sharon Farb, Larry

4    Loeher, and Patricia O'Donnell could be proper *Ex parte Young* defendants, at

5    least at the pleading stage.[3]  Accordingly, Defendants have not moved to dismiss

6    them as improper defendants.  Instead, Defendants have moved to dismiss the

7    claims brought against them for failure to state a claim.

8         But President Yudof and Chancellor Block must be dismissed for the

9    additional reason that the Complaint fails to connect them to the events alleged.

10   The Federal Circuit has held that "[w]hen a violation of federal law is alleged . . .

11   the state official whose actions violate that law is the rightful party to the suit and

12   prospective injunctive relief can only be had against him."  *Pennington Seed, Inc.*

13   *v. Produce Exchange No. 299*, 457 F.3d 1334, 1342 (Fed. Cir. 2006).  Plaintiffs do

14   not dispute that *Pennington Seed* provides the applicable framework, but instead

15   argue that, unlike in *Pennington Seed*, they have only sued individuals whose

16   actions violated federal law.  A comparison of *Pennington Seed* to Plaintiffs'

17   complaint proves that this is not the case.

18        The plaintiffs in *Pennington Seed* sued a variety of officials within the

19   University of Arkansas, including the Chairman of the Board for the University

20   System, the President of the University System, and the Chancellor of the

21   University of Arkansas at Fayetteville.  *Id.* at 1337.  The Federal Circuit concluded

22   that, as to *all* of these defendants, their supervisory positions were insufficient to

23   create a "nexus between the violation of federal law and the individual accused of

24   violating that law."  *Id.* at 1342-43.  The Federal Circuit therefore affirmed the

25   _____

26   [3]     Although Defendants accept the truth of the Complaint's allegations for
     purposes of this motion, the evidence will show that Sharon Farb was not, in fact,
27   involved in any way with UCLA's streaming program.  If necessary, Defendants
     will make a motion with supporting evidence to have her dismissed as an improper
28   defendant at the appropriate time.

1   dismissal of these defendants.

2       This Complaint fails for the same reason.  As in *Pennington Seed*, Plaintiffs

3   have sued the president of the university system in addition to the chancellor of the

4   school in question.  Nevertheless, Plaintiffs argue that it is "particularly

5   disingenuous of Defendants to suggest that Dr. Block was unconnected to the

6   specific actions complained of since it was the Office of the Chancellor that was at

7   the center of the entire series of events leading to this lawsuit."  Opp. at 9 n.16.

8   But Plaintiffs miss the point.  The question is not whether a defendant's *office* was

9   somehow "involved," but rather whether the complaint alleges "an actual violation

10  of federal law by that individual."  *Pennington Seed*, 457 F.3d at 1343.  The

11  Complaint fails to make such allegations.  Similarly, Plaintiffs' contention that "[i]t

12  would . . . be difficult to believe that this series of events could have unfolded

13  without any involvement of President Yudof," Opp. at 9 n.16, is a nonstarter.

14  What matters is whether the complaint *alleges* involvement, and whether that

15  "involvement" amounts to violation of law by that individual.  Again, there are no

16  factual allegations regarding any involvement by President Yudof (nor, consistent

17  with Rule 11, could there be any such allegations).  Merely alleging supervisory

18  authority, as Plaintiffs have done, is not enough.

19       **3.    The officials sued in their individual capacities are immune from liability.**

20

21       **a.    The individual defendants are entitled to qualified immunity for the alleged violations of federal law.**

22       "Government officials performing discretionary functions generally are

23  shielded from liability for civil damages insofar as their conduct does not violate

24  clearly established statutory or constitutional rights of which a reasonable person

25  would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73

26  L. Ed. 2d 396 (1982).  This immunity can only be overcome if a reasonable official

27  would have known that the alleged conduct violated a clearly established right.

28  *See Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

6

1   This standard "gives ample room for mistaken judgments by protecting all but the

2   plainly incompetent or those who knowingly violated the law." *Hunter v. Bryant*,

3   502 U.S. 224, 229, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) (internal quotation

4   marks omitted).

5   　　　The Supreme Court has repeatedly "stressed the importance of resolving

6   immunity questions at the earliest possible stage in litigation." *Pearson v.*

7   *Callahan*, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (internal quotation marks

8   and citation omitted).  Because the Complaint fails to allege the violation of a

9   clearly established right, the individual defendants are entitled to qualified

10  immunity.  And because the allegations in the Complaint establish the necessary

11  facts, such a determination can be made on a motion to dismiss.[4]

12  　　　Ambrose does not dispute that UCLA had the right to publicly perform its

13  DVDs.  Plaintiffs nonetheless contend that a reasonable official would have

14  known—even in the absence of any guidance in case law—that the *method* of

15  publicly performing the works subjected it to liability.  This is so, under Plaintiffs'

16  theory, because streaming implicates other rights protected under copyright, such

17  as the right to display, the right to distribute, and the right to reproduce.

18  　　　But as explained in Defendants' motion, two of these rights are not

19  implicated by the factual allegations in the complaint, and the third—the right to

20  reproduce—is reasonably understood to be a fair use.  As to the right to display

21  and the right to distribute, Plaintiffs' response to UCLA's motion is desperate.

22  They contend that any requirement that their Complaint plead the factual basis of

23  infringement, such as the non-sequential display required for infringement of the

24  _____

25  [4]　　　Plaintiffs suggest that Defendants rely on facts not in the Complaint to
    support their qualified immunity argument.  Not so.  The facts alleged in the
26  Complaint are sufficient to establish Defendants' entitlement to qualified
    immunity.  To the extent Defendants' motion refers to allegations *not* in the
27  Complaint, it does so merely to illustrate the sort of required allegations that are
    *absent*.
28

7

display right for a motion picture, "would impose a more complex standard," Opp. at 14, than is necessary.  But this standard is no more than what the Supreme Court requires.  *See Ashcroft v. Iqbal.*  129 S. Ct. 1937, 1951, 173 L. Ed. 2d 868 (2009). It is Plaintiffs' burden to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.  The factual allegations in the complaint are in fact *inconsistent* with infringement of the distribution and display rights.  Simply using the words "distribute" and "display" is not sufficient to state a cause of action, as a court is not permitted to credit "[t]hreadbare recitals of the elements of a cause of action" in the absence of supporting factual allegations.  *Id.*

As for the contention that an improper copy is made in the process of streaming, Defendants noted in their motion that, where a particular use of a work is authorized, incidental exercises of other exclusive rights in order to enable that permitted use are non-infringing fair uses.  Thus, given that the Complaint reflects that UCLA was authorized to publicly perform the DVDs in question, any incidental copy made in the furtherance of such a performance is a protected fair use.  The United States Copyright Office itself has opined that, in the context of streamed performances, copies that serve no purpose other than to enable that authorized performance are fair uses.  Specifically, the Copyright Office considered the status of a "buffer" copy that is created in the process of streaming. It concluded that "there is a strong case that the making of a buffer copy in the course of streaming is a fair use."  U.S. Copyright Office, DMCA Section 104 Report at xxiv (2001).

The Copyright Office's application of the fair use factors in the context of streaming is remarkably similar to that in Defendants' opening brief.  As to the first factor, the purpose and character of the use, the Office notes that "[b]uffer copies are a means to a noninfringing and socially beneficial end—the licensed performance of these works."  *Id.*  Moreover, "there is no commercial exploitation

1  intended or made of the buffer copy in itself." *Id.* This is all the more true in this

2  case, as the performance in question was for a "nonprofit educational purpose[],"

3  which is explicitly recognized in the statute as supporting a finding of fair use. 17

4  U.S.C. § 107. The Copyright Office concluded that:

5  In the case of temporary buffer copies, we believe that the equities unquestionably favor the user. The sole purpose for making the buffer

6  copies is to permit an activity that is licensed by the copyright owner and for which the copyright owner receives a performance royalty.

7  DMCA Section 104 Report at xxv.

8  While Plaintiffs' complaint does not allege that Defendants made "buffer

9  copies," it does allege that the defendants' process of streaming made a "copy" to

10  which the Copyright Office's analysis is equally applicable. Like the Copyright

11  Office analysis, there is no allegation in the Complaint (nor could there be) that

12  any copy made by Video Furnace is used for anything other than enabling the

13  process of streaming. Therefore, the sole purpose for making such a copy "is to

14  permit an activity that is licensed by the copyright owner"—namely, the

15  performance of the work. *Id.*

16  Given the fact that UCLA had the right to perform the Ambrose DVDs, in

17  addition to the fact that the U.S. Copyright Office indicated that any copy created

18  in the streaming process was a fair use, a reasonable official would not have

19  believed that streaming violated a clearly established right. Indeed, UCLA's

20  streaming is not infringement. Therefore, defendants are entitled to qualified

21  immunity.

22          **b.      The individual defendants are immune from personal
23                   liability for violations of state law pursuant to California
                     Government Code § 820.2.**
24

25  Under California law, "a public employee is not liable for an injury resulting

26  from his act . . . where the act . . . was the result of the exercise of the discretion

27  vested in him, whether or not such discretion be abused." *See* Cal. Gov't Code

28  § 820.2. A "discretionary" act is one that "requires personal deliberation, decision,

9

1   and judgment . . . ."  *Morgan v. Yuba Cnty.*, 230 Cal. App. 2d 938, 942, 41 Cal.

2   Rptr. 508 (1964) (internal quotation marks and citation omitted).  Because the

3   decision to stream the DVDs in question was the result of such a deliberation, the

4   individuals are immune.

5       Plaintiffs' only rejoinder to this immunity is to argue that "it is inappropriate

6   to address such a discretionary immunity claim at the demurrer stage."  Opp. at 21

7   n.33.  Not so.  The California Supreme Court itself has affirmed dismissal of a

8   complaint at the pleading stage where the challenged conduct constituted an

9   exercise of discretion.  *See Caldwell v. Montoya*, 10 Cal. 4th 972, 42 Cal. Rptr. 2d

10  842 (1995) (affirming dismissal of complaint pursuant to § 820.2).  Because the

11  allegations in the complaint *compel* the conclusion that challenged conduct was an

12  exercise of discretion, the individual defendants are immune.

13  **B.    AIME Has No Standing to Sue Under the Declaratory Judgment Act.**

14      **1.    AIME cannot establish associational standing.**

15      The Supreme Court's opinion in *Hunt v. Washington State Apple Advertising*

16  *Commission* identifies three requirements for an association to bring suit on behalf

17  of its members:

18      (a) its members would otherwise have standing to sue in their own
    right; (b) the interests it seeks to protect are germane to the
19  organization's purpose; and (c) neither the claim asserted nor the
    relief requested requires the participation of individual members in the
20  lawsuit.

21  432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977).

22      As explained in Defendants' motion, AIME fails to satisfy the first and third

23  requirements.  In response, AIME relies on a single conclusory assertion to support

24  the finding that AIME's members have standing in their own right.  *See* Am.

25  Compl. ¶ 15.  But the Complaint fails to allege facts to support this conclusion.

26  Moreover, AIME fails to attach any supporting Copyright registrations to its

27  complaint, and fails even to allege that its members have registered their

28  copyrights such that they would be permitted to bring suit.  A valid registration is

10

1   an element of a cause of action for copyright infringement and must be pleaded in

2   the complaint.  *See Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612, 615

3   (9th Cir. 2010).

4         AIME's argument as to *Hunt*'s third prong is nonsensical.  AIME argues that

5   "the third prong of *Hunt* is no longer considered a constitutional requirement."

6   Opp. at 11.  But this is irrelevant.  The source of the requirement—whether

7   constitutional or prudential—does not make it any less a requirement.  While

8   AIME is correct that Congress *could* remove such prudential limitations, *Congress*

9   *has not done so here*.  On the contrary, by forbidding all but the legal or beneficial

10  owner of the copyright from bringing suit, 17 U.S.C. § 501(b), Congress evidenced

11  its intent *not* to allow associational standing for copyright infringement claims.

12        Next, AIME argues that:

13        Ambrose's participation as a plaintiff in the suit is a given, and any
          argument as to its ownership rights will be heard in the context of its
14        standing as such.  Therefore, no additional individualized inquiries
          need to be made, and no participation of other members is required.

15  Opp. at 12.  But Ambrose's ownership rights have nothing to do with the

16  ownership rights of other AIME members.  Those other members will still be

17  forced to participate because the nature and scope of the other members'

18  copyrights and the nature of rights transferred to UCLA may—and likely will—be

19  different for each member's works.  If AIME's claim is allowed to proceed, its

20  adjudication will require an individualized inquiry as to UCLA's relationship with

21  these various other entities.

22        AIME's suggestion that its claim is different because it "is seeking a

23  declaratory judgment and not damages," Opp. at 12, is doubly unpersuasive.  First,

24  AIME is not in fact seeking only a declaratory judgment.  Its complaint also seeks

25  a "permanent injunction . . . prohibiting the Defendants from engaging in future

26  copying and streaming of content licensed from AIME members . . . ."  Am.

27  Compl. ¶ 101.  Any such injunction could be granted only under the Copyright

28

11

Act, as the Declaratory Judgment Act does not provide an independent substantive basis for coercive relief.  And as pointed out in Defendants' motion, AIME lacks statutory standing under the Copyright Act to obtain such an injunction.  "[O]nly copyright owners and exclusive licensees of copyright may enforce a copyright or a license."  *Sybersound Records, Inc. v. UAC Corp.*, 517 F.3d 1137, 1144 (9th Cir. 2008).  Regardless, the nature of AIME's substantive claim for relief requires individualized inquiries, so the choice of remedy is irrelevant.  Any declaration of rights necessarily requires an individualized assessment of the rights held by each individual member and the rights transferred to UCLA.  No general declaration could be made based solely on the facts as to the respective rights between Ambrose and UCLA.

Finally, given that AIME's sole claim for relief arises under the Declaratory Judgment Act, this Court should exercise its discretion and decline to hear it.  To hear the claim would sanction AIME's attempt to plead around Congress's limitation of standing for infringement claims and, because AIME is not the true party in interest, would impose needless procedural complications on the Court and on Defendants.

### 2.  AIME has no individual standing because it has not suffered a cognizeable injury in fact.

The only concrete injury AIME identifies in its complaint is the fact that it has diverted resources "to the action of prospective enforcement."  Am. Compl. ¶ 16.  In other words, it claims standing because it has been "forced" to expend resources on litigation.  But case law is clear that "an organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit."  *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990).

AIME seeks to muddy the waters, analogizing its case to *Havens Realty Corp. v. Coleman*.  455 U.S. 363, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982).  In

1   *Havens*, the Supreme Court considered the standing of an organization called

2   Housing Opportunities Made Equal, or "HOME".  *Id.* at 367.  HOME alleged that

3   it operated a housing counseling service.  *Id.* at 368.  The case concerned

4   allegations that the defendant wrongfully "steer[ed] members of racial and ethnic

5   groups to buildings occupied primarily by members of such racial and ethnic

6   groups," *id.* at 366 n.3, and HOME contended that the defendants' actions required

7   HOME "to devote significant resources to identify and counteract the defendant's

8   racially discriminatory steering practices," *id.* at 379.

9       The Supreme Court concluded that if defendants' "steering practices have

10   perceptibly impaired HOME's ability to provide counseling and referral services

11   for low . . . income homeseekers, there can be no question that the organization has

12   suffered injury in fact."  *Id.*  Crucially, HOME did not contend that it was injured

13   by virtue of its choice to initiate a lawsuit.  Instead, its injury derived from the fact

14   that its normal counseling and referral operations were impaired by defendants'

15   unlawful conduct.

16       To rely on *Havens* to establish its injury in fact, then, AIME must allege that

17   Defendants' conduct "perceptibly impaired" its normal operations.  AIME fails to

18   do so.  Instead, it asserts without factual support or allegations in the Complaint

19   that it "has been forced to spend much of its limited resources directly addressing

20   the problem created by the Defendants for the educational video publishers . . . ."

21   Am. Comp.  ¶ 16.  But the only specific expenditure referred to in the complaint is

22   "the action of prospective enforcement."  *Id.*  That is to say, its injury is the cost of

23   this lawsuit.  But if such an "injury" is sufficient for purposes of standing, then

24   "any litigant could create injury in fact by bringing a case, and Article III would

25   present no real limitation."  *Spann*, 899 F.2d at 27.

26   **C.    Ambrose Fails to Allege a Plausible Claim for Copyright Infringement.**

27       The Complaint alleges the infringement of four distinct exclusive rights

28   under § 106 of the Copyright Act: the rights to publicly perform, to publicly

13

display, to distribute, and to copy.  None is plausible, so they all must be
dismissed.

First, despite the fact that UCLA has been sued for infringement of
Ambrose's public performance right, *see* Am. Compl. ¶ 93, Ambrose now
concedes that UCLA has the right to publicly perform the DVDs in question, *see*
Am. Compl., ex. 8 ("All purchases by schools and libraries include public
performance rights.").

Second, Ambrose has failed to allege facts supporting its claim for relief as
to infringement of the public display and distribution rights.[5]  *See supra* Part
II.A.3.a.

Third, any copy made of the contents of the DVDs in the process of
streaming constitutes a fair use, and is therefore not infringement.  As noted in
Defendant's motion, the Ninth Circuit has held that incidental exercises of
exclusive rights are non-infringing when they do nothing other than enable
authorized conduct.  *See, e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146,
1169-70 (9th Cir. 2007) (finding the creation of a short-term copy to be a fair use).
Moreover, as noted above, the U.S. Copyright Office has concluded that the
making of a copy in the course of streaming is a fair use because such a copy is a
necessary incident to an authorized performance.  DMCA Section 104 Report at
xxiv.  Similarly here, the alleged copy does nothing more than enable an
authorized streaming performance.

Ambrose does not address this authority directly, but rather contends that the
court must conduct "a factual evaluation based on four stated criteria *as applied to*

---

[5]     Contrary to the Plaintiffs' suggestion, *see* Opp. at 17 n.28, Defendants
continue to believe that their streaming was independently authorized by section
110(1) and 110(2) of the Copyright Act.  But reliance on these provisions for
purposes of this motion is unnecessary because the allegations in and attachments
to the Complaint establish the legality of Defendants' conduct on other grounds.
Defendants reserve the right to rely on these sections in the future if their motion is
not granted.

*the specific use of each work* (more than three dozen [Ambrose] DVDs)."  Opp. at 17 (emphasis added).  But the Supreme Court itself has employed a generalized fair-use analysis in the context of a copyright challenge to the use of a new technology.  In *Sony Corp. of America v. University City Studios, Inc.*, the Supreme Court determined that use of a VCR to "time-shift" copyrighted programs was a fair use.  464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984).  The Court never conducted a video-by-video analysis, and instead relied on the "in-gross" analysis that Ambrose believes to be forbidden.

This Court should do the same as to Plaintiffs' challenge to Video Furnace.  As in *Sony*, Ambrose here contends that the use of a particular technology constitutes infringement of one of the exclusive rights under copyright.  The technology is alleged to function in the same way as to the various DVDs, and Ambrose does not dispute that UCLA has the right to publicly perform all the Ambrose DVDs at issue.  The common facts compel the conclusion that UCLA was permitted to publicly perform the DVDs, and that any incidental copy is a protected fair use.

**D.      Ambrose Similarly Fails to Allege a Factual Basis for its DMCA Claim.**

As Defendants argued in their motion to dismiss, Ambrose has failed to state a claim as to violation of either § 1201(a) or § 1201(b) of the DMCA.

The Complaint fails to allege any facts supporting a cause of action under § 1201(a).  Section 1201(a) forbids both the use of, and the trafficking in, a device that circumvents a technological measure that effectively controls *access* to a copyrighted work.  According to Nimmer, this provision "bars one whom technology locks out of a copyrighted work from breaking into it."  Nimmer on Copyright § 12A.03[A][1][a] (internal quotation marks omitted).

There is no allegation in the Complaint (because there could be none) that Video Furnace allows one to illegally access (i.e. break into) a copyrighted work.  The owner or licensee of a DVD has the right to access that DVD and therefore has

1   no need to break into it.  The facts alleged indicate that Video Furnace permits the

2   user to copy the content of a DVD, but there are no allegations that Video Furnace

3   allows the unauthorized access to a DVD.

4        Ambrose's claim under § 1201(b) also fails. Ambrose alleges violation of

5   § 1201(b) based upon the fact that Video Furnace allegedly circumvents a

6   technological measure that prevents the copying of the Ambrose DVDs.  Am.

7   Compl. ¶ 63; *see also* Opp. at 20.  But unlike § 1201(a), § 1201(b) only imposes

8   liability for *trafficking* in a device, not for *using* it. The Ninth Circuit has explained

9   that a defendant is liable under § 1201(b) only when he "traffic[s] in circumventing

10  devices that facilitate infringement." *MDY Industries, LLC v. Blizzard*

11  *Entertainment, Inc.*, 629 F.3d 928, 45 (9th Cir. 2010).  Thus, the act of

12  circumventing a technological measure to prevent copying simply does not violate

13  § 1201(b).

14       Ambrose also fails to allege that UCLA manufactured, imported, offered to

15  the public, provided, or otherwise trafficked in Video Furnace as required to state a

16  claim under § 1201(b).  Instead, Ambrose vaguely alleges on information and

17  belief that UCLA "worked in close coordination with HVS and a few other

18  universities[] to develop Video Furnace applications for use by higher education."

19  Am. Compl. ¶ 60.  According to Ambrose, this coordination and UCLA's

20  "willingness to lend [its] name and reputation to the marketing efforts of" Video

21  Furnace amounts to "trafficking."  *Id.* ¶ 61.

22       But Ambrose alleges no facts regarding the substance of UCLA's supposed

23  assistance with the development of Video Furnace, relying instead on vague

24  conclusory assertions.  It is impossible to say what Ambrose means by "worked in

25  close coordination," and without more specificity it is impossible to determine

26  whether such coordination would amount to a violation of the statute.  "Where a

27  complaint pleads facts that are merely consistent with a defendant's liability, it

28  stops short of the line between possibility and plausibility of entitlement to relief."

16

1    *Iqbal*, 129 S. Ct. at 1949 (internal quotation marks omitted).  The claim must

2    therefore be dismissed.

3    **E.      Ambrose's Claims Under California State Law are Either Preempted by
             the Copyright Act or are Insufficiently Pled.**

4
5              **1.      Ambrose concedes that its primary contract claim is preempted,
                       and any other claim is insufficiently pled.**

6              The Copyright Act "specifically preempts all legal or equitable rights that

7    are equivalent to any of the exclusive rights within the general scope of copyright."

8    *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th Cir. 2005) (internal

9    quotation marks omitted).

10             Ambrose's Complaint alleges that Defendants' streaming of its DVDs

11   breached the 2006-2007 Agreement.  The body of the Complaint identifies the

12   "pertinent part" of the Agreement as the provision forbidding the customer from

13   duplicating or transmitting the programs "by cable or otherwise, on any multi-

14   receiver open or internet system . . . ."  Am. Compl. ¶ 37.  However, Ambrose now

15   concedes that, under the law in the Ninth Circuit, a state-law cause of action for

16   breach of this provision is preempted.[6]

17             Instead, Ambrose now contends that it has adequately alleged the breach of

18   other contract provisions that do not overlap with the rights protected by the

19   Copyright Act.  In particular, Ambrose argues that Defendants are liable for breach

20   of the provision requiring that each program be exhibited "only in its entirety" with

21   "complete copyright notices and credits."  *See* Opp. at 24, citing Am. Compl. ¶ 83.

22   But Ambrose has not alleged a factual basis for breach of this provision.  On the

23   contrary, the substance of the complaint refers only to breach of the provision

24   purportedly restricting duplication and streaming.  *See, e.g.*, Am. Compl. ¶ 50

25   (referring to "license restrictions on streaming AVP videos"); ¶ 74 (referring to

26   _____

27   [6]      *See* Opp. at 5 n.9 ("Ninth Circuit decisions suggest that breach of contract
     claims based solely on Defendants' streaming practices would be held to be

28   preempted.").

17

restrictions "prohibiting duplication and transmission" of the programs).

The only mention of the other contract terms appears in the cause of action itself, where Ambrose alleges that Defendants "have breached numerous covenants contained in the 2006-2007" Agreement.  The Complaint proceeds to list a variety of other provisions, but alleges no facts supporting any breach thereof.  Indeed, notwithstanding the allegations that appear for the first time in Plaintiffs' Opposition, the Complaint does not allege any facts supporting the inference that UCLA failed to exhibit the entirety of the programs, nor does it allege that the programs were exhibited without copyright notices.  Therefore, to the extent that a claim for breach of such a provision is not preempted, Plaintiffs fail to allege the facts necessary to state such a claim.

**2.      Ambrose's claim for anticipatory breach of contract is preempted and, in any event, is not cognizeable under California law.**

Ambrose's claim for anticipatory breach of the alleged 2008-2011 Agreement is not only preempted and inadequately pled for the reasons discussed above, but is also improper under California law.  California does not recognize a claim for anticipatory breach of contract where the plaintiff has no ongoing contractual obligations.

As noted in Defendants' motion, in California a party may not bring an anticipatory breach claim where the contract at issue has become unilateral.  *See Minor v. Minor*, 184 Cal. App. 2d 118, 123, 7 Cal. Rptr. 455 (1960).  "The theory underlying this rule is that since the plaintiff has no future obligations to perform, he is not prejudiced by having to wait for the arrival of the defendant's time for performance in order to sue for breach."  *Diamond v. Univ. of So. California*, 11 Cal. App. 3d 49, 53-54, 89 Cal. Rptr. 302 (1970).  Ambrose alleges in its Complaint that it "has duly performed each and every covenant and/or condition of the 2008-2011 [Agreement]."  Am. Compl. ¶ 86.  Therefore, it "has no future obligations" and its claim must be dismissed.

18

1   Notwithstanding the unambiguous allegations in its Complaint, Ambrose

2   now seeks to backtrack and identify some ongoing obligation that might prejudice

3   it.  It fails to do so.  The only so-called obligations it identifies are its obligation to

4   replace defective products and its promise not to disclose its customers' personal

5   information.  The first obligation is illusory: Defendants would have known upon

6   delivery if the products were defective.  Accordingly, as a practical matter this

7   "obligation" no longer exists.  As to the second obligation, Ambrose suggests that

8   it is prejudiced by its obligation not to disclose private information.  Of course, in

9   reality such a promise does not impose any burden on Ambrose; it merely

10   preserves the status quo.  Therefore, Ambrose would not be "prejudiced by having

11   to wait for" any claim for breach to accrue.

12       **3.    Ambrose's remaining state-law claims are preempted for the
             same reasons.**

13   Ambrose's other state-law claims—for tortious interference, unjust

14   enrichment, and breach of the covenant of good faith and fair dealing—must be

15   dismissed for similar reasons.

16   "[C]laims for unjust enrichment are . . . generally preempted" by the

17   Copyright Act.  *Zito v. Steeplechase Films, Inc.*, 267 F. Supp. 2d 1022, 1027 (N.D.

18   Cal. 2003).  "[W]here the unjust enrichment arises from defendants' unauthorized

19   use of a copyright work," the "extra element does not qualitatively change the

20   rights at issue, the rights the plaintiff holds in the copyrighted work, and does not

21   avoid preemption."  *Id.  Chesler/Perlmutter Products Inc. v. Fireworks

22   Entertainment, Inc.*, cited by Plaintiffs, is not to the contrary.  In *Chesler*, the

23   alleged unjust enrichment related to "an explicit promise to pay Plaintiff certain

24   sums of money."  177 F. Supp. 2d 1050, 1059 (C.D. Cal. 2001).  The court rightly

25   concluded that because the challenged conduct was the failure to pay the money

26   that was promised, rather than the copying of the work in question, the claim

27   contained an extra element that changed the nature of the action.  This case,

28

19

1  however, is not about such an explicit promise.  On the contrary, Ambrose's claim

2  for unjust enrichment is premised solely on allegations relating to the rights

3  protected under Copyright law.

4  　　　　The same is true as to Ambrose's claims for tortious interference.  While

5  Ambrose is correct that such a claim requires proof of extra elements, these

6  elements on their own "do[] not make the rights qualitatively different" from the

7  protections of the Copyright Act.  *Oldcastle Precast, Inc. v. Granite Precasting &*

8  *Concrete, Inc.*, No. C10-322, 2010 WL 2217910, at *3 (W.D. Wash. June 1, 2010).

9  On the contrary, where "the act of unauthorized publication . . . causes the

10  violation[,] . . . tortious interference claims are preempted."  *Falcon Enters., Inc. v.*

11  *Nobel Developments, Inc.*, CV06-1404, 2007 WL 737347, at *3 (W.D. Wash. Mar.

12  5, 2007) (internal quotation marks and citation omitted).  Because the interference

13  alleged in the Complaint consists of the exercise of a right protected by the

14  Copyright Act, such claims are preempted.[7]

15  　　　　Finally, as for Ambrose's claim that Defendants breached the implied

16  covenant of good faith and fair dealing, a case cited in Ambrose's own brief

17  explains why the claim fails.  The court in *Celestial Mechanix, Inc. v. Susquehanna*

18  *Radio Corp.* dismissed the plaintiff's claim under the implied covenant, explaining

19  that because "the same factual allegations form the basis of this claim and

20  Plaintiff's claims for breach of contract, Plaintiff has failed to state an additional

21  claim for breach of the implied covenant."  No. 03-5834, 2005 WL 4715213, at *9

22  (C.D. Cal. Apr. 28, 2005).  Therefore, even if this claim were not preempted for

23  the reasons discussed above, it must be dismissed.

24

25  _____

26  [7]　　*MDY Industries, LLC v. Blizzard Entertainment*, cited by Plaintiffs, does not apply to Plaintiffs' complaint.  629 F.3d 928 (9th Cir. 2010).  In *Blizzard*, the contract rights in question were "not equivalent to any of [Blizzard's] exclusive

27  rights of copyright."  *Id.* at 957.  Here, Plaintiffs' tortious interference claims are premised on a right that is indistinguishable from the exclusive rights of copyright.

28  *Blizzard*'s holding therefore does not apply.

### III.   CONCLUSION

Plaintiffs' Opposition misrepresents both the facts alleged and the legal claims asserted, and it seeks to rely on theories that have no basis in the Complaint. A careful examination of the arguments reveals that Plaintiffs have no case. First, the Eleventh Amendment and individual immunities mandate the dismissal of this action. Second, AIME has suffered no identifiable injury in fact, and cannot represent its constituents in a fact-intensive lawsuit. Third, UCLA has the right to publicly perform Ambrose's programs, and any incidental copy is a protected fair use. As to Ambrose's remaining claims, they are either preempted or fail to state a plausible claim for relief. Accordingly the Complaint must be dismissed. Because Plaintiffs have already attempted to cure the inadequacies of the Complaint via amendment, and have failed to do so, dismissal should be with prejudice.

Dated:  April 18, 2011                                  KEKER & VAN NEST LLP


                                                        By:   /s/ R. James Slaughter
                                                        R. JAMES SLAUGHTER
                                                        Attorneys for Defendants